**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | | |
|---|---|---|
| BRIAN LUMBUS, JR. | : | Case No. 1:23-cv-196 |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | Judge Jeffery P. Hopkins |
| vs. | : | Magistrate Judge Stephanie K. Bowman |
| | : | |
| STEVE WEISBAR, et. al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## REPORT AND RECOMMENDATIONS

Plaintiff Brian Lumbus Jr. ("Plaintiff"), proceeding without counsel, filed an amended complaint (the "Complaint"), alleging violations of his civil rights pursuant to 42 U.S.C. § 1983. Doc. 17.  The matter is currently before the undersigned Magistrate Judge to conduct the initial screen required by law. 28 U.S.C. § 1915A(a).

For the reasons stated below, the Court **RECOMMENDS** that the following claims be allowed to **PROCEED**: (1) First Amendment retaliation and harassment claims against defendants Weishar, Tabor, and Ritz in their individual capacities; (2) Eighth Amendment failure to protect claims against defendants Waggoneer, Tabor and Weishar in their individual capacities; and (3) civil conspiracy against Tabor, Weishar and Ritz.  The Court **RECOMMENDS** that all remaining claims against all defendants in their individual and official capacities be **DISMISSED** for failure to state a claim.

### I.  FACTUAL BACKGROUND AND SUMMARY OF CLAIMS

On August 17, 2022, Plaintiff filed a complaint in the Northern District of Ohio seeking relief pursuant to 42 U.S.C. § 1983.  Doc. 1.  Following payment of the filing fee, *see* text notation

on September 1, 2022, and transfer to this Court, Docs. 5, 6, Plaintiff filed an amended complaint (the "Complaint'), Doc. 17, naming the following defendants in their individual and official capacities: (1) Steve Weishar ("Weishar"), Investigator at Grafton Correctional Institution ("GCI"); (2) John Tabor ("Tabor"), Investigator at Lebanon Correctional Institution ("LeCI"); (3) LeCI Warden Chae Harris ("Harris"); (4) Deputy LeCI Warden Ellen M. Myers ("Myers"); (5) LeCI Inspector Jody Sparks ("Sparks"); (6) LeCI Correctional Officer R. Waggoner ("Waggoner"); (7) LeCI Correctional Officer Koontz ("Koontz"); (8) LeCI Lieutenant Liming ("Liming"); (9) LeCI Sargent C. Collins ("Collins"); (10) Ohio Department of Rehabilitation and Corrections ("ODRC") Director Annette Chambers-Smith ("Chambers-Smith"); (11) "John Doe Medical Department" at LeCI ("John Doe Medical Department"); (12) Ohio State Penitentiary ("OSP") Investigator D. Ritz ("Ritz"); (13) OSP Warden C. Bracy ("Bracy"); (14) OSP Warden Assistant Thomas Horten ("Horten"); (15) OSP Lieutenant and R.I.B. Chairman Joseph Santha ("Santha"); and (16) OSP Captain and "R.I.B." Chairman "Ms. Drummond" ("Drummond").[1] Doc. 17 at PageID 235–36, 238–40. Doc. 1-1.

The Complaint details a series of events beginning on or about August 3, 2020,[2] while Plaintiff was incarcerated at GCI. Doc. 17 at PageID 242. Plaintiff alleges that on that day he and several other inmates had attempted to help a fellow inmate who was intoxicated on "some type

---

[1] In the body of the Complaint, Plaintiff describes actions by several officers that he identifies by name but has not named as defendants. *See* Doc. No. 17 at PageID 242–43 (naming GCI Sergeant Scott and Unit Manager Wesson); PageID 259 (alleging "Edwards" wrote a false conduct report about Plaintiff at the bequest of defendant Tabor); PageID 243–44 (alleging Ware purposefully did not find in Plaintiff's favor when he filed a grievance against Weishar); PageID 262 (alleging investigator Kerns and Tabor spoke with Plaintiff about being an information to which Plaintiff refused resulting in additional sanctions against him). Because these individuals are not named as defendants and are not parties to this case, the Court declines to analyze Plaintiff's statements with respect to these non-defendants and **RECOMMENDS** that any purported claims with respect to Scott, Wesson, Edwards, Ware, and Kerns be **DISMISSED**. S*ee Chapple v. Franklin Cnty.*, No. 2:21-CV-5086, 2022 WL 856815, at *16 (S.D. Ohio Mar. 23, 2022), *report and recommendation adopted as modified sub nom. Chapple v. Franklin Cnty. Sheriff's Officers FCCC 1 & 2,* No. 2:21-CV-05086, 2022 WL 16734656 (S.D. Ohio Nov. 7, 2022).

[2] Plaintiff refers to the described incidents occurring both on August 2 and August 3 in his Complaint. *See* Doc. No. 17 at PageID 242.

of substance" back into his cell so the inmate would not get into trouble.  *Id.*  Later that night Plaintiff alleges Weisher placed him into administrative segregation pending investigation into Plaintiff's involvement with several intoxicated inmates.[3]  *Id.*

On August 10, 2020, Plaintiff was removed from segregation and taken to Weishar's office where he was interviewed by Weishar, Sergeant Scott, and Unit Manager Wesson, about whether Plaintiff knew who was supplying the inmate population with the intoxicating substances that were used by inmates on August 3, 2023.  *Id.*  Plaintiff denied any knowledge of the supplier, but the officers insisted he knew and told Plaintiff the only way Plaintiff would be released from segregation was to become an informant, providing Weishar information on inmates and/or staff who were allowing intoxicants into the prison.  *Id.* at PageID 242–43.  Further, Plaintiff claims he was told that, if he refused to act as an informant, then in addition to remaining in segregation he would have his security level increased to a level 3 where his daily privileges would be further restricted.  *Id.* at PageID 243.  As a result of the threats of a return to segregation and privilege restriction, Plaintiff agreed to act as an informant.  *Id.*

Around a week later, Plaintiff failed to provide any information, and was brought back to Weisher's office where Weishar threatened to return him to segregation if he did not comply.  *Id.* Plaintiff alleges at that time he told Weishar and an unnamed sergeant that simply asking Plaintiff to act as an informant put his personal safety at risk.[4]  *Id.*

---

[3] Plaintiff alleges that "medical staff" later determined that the inmate Plaintiff was seen with on August 3 as well as several other inmates had taken the "intoxicating substance" resulting in their being placed under medical observation. Doc 17 at PageID 242.

[4] It is unclear from the Complaint whether Plaintiff was returned to segregation at that time.  *See Id.* at PageID 234–44.

On or about March 6, 2021, Plaintiff alleges that without notice and without reason he was taken to segregation at the request of "the investigator."[5]  *Id.* at 243.  Plaintiff immediately filed an informal complaint and a grievance against the "investigator" for retaliation and harassment which was later dismissed by institutional inspector Ware, who indicated to Plaintiff that she was unable to rule against Weishar.[6]  *Id.* 243–44.

Following dismissal of his grievances by Ware, Plaintiff contacted his family who in turn contacted the Ohio State Highway Patrol to report Weishar's behavior.  *Id.* at PageID 244.  Ultimately Plaintiff filed a police report against Weishar regarding his harassment.  *Id.*  Plaintiff alleges Weishar became upset upon learning of the police report, elevating the retaliation and harassment towards Plaintiff including subjecting Plaintiff to a strip search and having his cell searched daily.  *Id.*

Plaintiff alleges that on March 11, 2021, Weishar filed a false conduct report accusing Plaintiff of being the inmate directly responsible for conveying intoxicating contraband substances into GCI, and that Plaintiff had conspired with other inmates in different parts of the prison to receive the contraband.  *Id.* at PageID 244–45.  Plaintiff submits Weishar issued his false report for the purpose of misleading the rules infraction board (the "RIB") into subjecting Plaintiff to further punishment and restrictions.  *Id.*

Allegedly the evidence against Plaintiff presented by the Weishar to the RIB consisted of information obtained from confidential statements from informants, the phone system, the J-pay system, and through the regular mail.  *Id.* at PageID 245.  Additionally, Plaintiff claims Weishar

---

[5] For the purposes of this initial review the Court presumes the "investigator" is Weishar as he is referred to as investigator Weishar in other portions of the Complaint addressing this same incident.

[6] Plaintiff notes that he was told by Ware she could not "go against the investigator" and rule in favor of inmates or her job would be at risk.  Doc. No. 17 at PageID 244.  Although Plaintiff complains that Ware's "improper investigation" of his grievances violated his right to due process and allowed the retaliation and harassment against him to continue, he does not name Ware as a defendant.

provided a false report that personal property belonging to Plaintiff containing evidence of intoxicating contraband substances in them had been obtained by Weishar,[7] the substances were tested by Weishar and determined to contain contraband, and that Plaintiff had admitted to ownership of the contraband. *Id.* at PageID 246–47. Plaintiff denies these claims. *Id.* at PageID 247.

Plaintiff alleges that he was denied access to the evidence against him at the disciplinary proceedings based on Weishar's conduct report, including the alleged statements made against him by informants, and that Weishar and the hearing officials claimed the names of the informants could not be divulged as it would put the informants at risk, resulting in the denial of Plaintiff's ability to call witnesses in his own defense. *Id.* at PageID 254–46, 248. Ultimately Plaintiff alleges the RIB relied upon the "false conduct report" from Weishar and a statement from a confidential informant, who Plaintiff claims he later discovered was a mentally ill inmate who in a letter to the GCI warden, ORDC Director Chambers-Smith and Plaintiff, admitted he was coerced by Weishar into providing false information about Plaintiff. *Id.* at PageID 247–48. As a result of the proceedings Plaintiff alleges he was transferred to LeCI, a higher security institution. *Id.* at PageID 248.

Three days after he arrived at LeCI, Plaintiff alleges that Weishar contacted LeCI investigator Tabor, seeking to continue the harassing and retaliatory tactics he had employed at GCI, to which Tabor agreed, resulting in frequent strip searches of Plaintiff's person and searches of his cell, the first of which took place on May 17, 2021. *Id.* at PageID 248–49. Tabor told Plaintiff that he was being searched to show him "this was the type of treatment you get when you write grievances on my staff and for thinking you are some kind of drug King pen." *Id.* at PageID

---

[7] Plaintiff described the contraband Weishar claimed to have found as a box containing "five I.D. size pieces of paper that was allege[d] to have synthetic chemicals soak on them." *Id.* at PageID 246.

5

249. Plaintiff alleges he denied being a drug dealer, and informed Tabor that he knew he was going to perform needless strip and cell searches in violation of prison rules and in violation of his first amendment rights but that Tabor and "S.T.G. conducted their search of [his] cell" anyway. *Id.*

The following day, May 18, 2021, Plaintiff alleges he filed an informal complaint with Tabor's supervisor, LeCI Warden Harris against Tabor due to the prior day's searches. *Id.* Harris responded to the grievance by stating that inmates are always subject to search. *Id.*

On or about June 16, 2021, Plaintiff alleges he was taken to Tabor's office, where Weishar was put on speaker phone. *Id.* at PageID 250. Weishar informed Plaintiff that he knew Plaintiff was the main source of certain synthetic drugs coming into GCI "even after" Plaintiff was no longer housed at GCI and threatened Plaintiff with being charged unless Plaintiff made a written false statement that he witnessed other inmates bring contraband into GCI. *Id.* at PageID 250–51. Plaintiff claims that Weishar told him he would "end the harassments and request for Tabor to not bother [Plaintiff] as well" if he signed a statement, pre-written by Weishar, admitting to witnessing several inmates bringing contraband into GCI. *Id.* at PageID 251. Plaintiff was then given the pre-written statement, which was marked as "confidential," and was told the statement was only to be used by RIB and that no others would see it or know that Plaintiff wrote it. *Id.* at PageID 251. Plaintiff alleges he signed the pre-written statement only to be "left alone" by Tabor and other officers at LeCI. *Id.*

Plaintiff submits that about a month after signing the pre-written statement, Weishar gave copies of Plaintiff's statement to several other inmates at their disciplinary hearings, placing Plaintiff at risk of inmate retaliation. *Id.* Plaintiff alleges that Weishar did so in retaliation for Plaintiff's prior utilization of the grievance system while at GCI. *Id.*

On June 21, 2021, while Tabor was returning some of Plaintiff's personal property to him, Tabor reviewed a conduct report from another inmate's proceeding where Plaintiff had been identified as a confidential informant by Weishar.  *Id.* at PageID  252.  Plaintiff alleges Tabor admitted that Plaintiff's name should have been kept confidential but denied knowing why Weishar released his name in the report.  *Id.*  Plaintiff also requested to Tabor that actions be taken to keep him safe as due to his name being released there was a possibility of him being "seriously assaulted by the inmate gang population at LeCI" but no action was taken.  *Id.*

On or about July 27, 2021, Plaintiff was taken to administration where he met with Tabor and "high level prison officials" who informed him he was going to segregation due to "major contraband" that had been found on the same cell block Plaintiff was housed in.  *Id.* at PageID 252–53.  Plaintiff alleges his July 27 segregation was also retaliation for Plaintiff's filing grievances regarding Weishar's harassment of Plaintiff.  *Id.* at PageID 253.

On August 3, 2021, Plaintiff was informed that the Ohio State Highway Patrol was at the prison to see him, but instead he was taken to administration, where only Tabor was present.  *Id.* Tabor informed Plaintiff that he knew Plaintiff was about to file a complaint against him for harassment, and that Plaintiff should stop "wasting his ink."  *Id.*  Plaintiff immediately filed a complaint for harassment against Tabor with inspector Sparks, which he asserts was never responded to.  *Id.*

Over the next several days Plaintiff alleges that he learned Tabor was accusing him of bringing drugs into LeCI via a package sent into the prison under another inmate's name.  The following day he was again taken to administration where he met an Ohio State Highway Patrol trooper who read him his rights regarding the package containing the drugs.  *Id.* at PageID 254–55.  Plaintiff told the trooper he believed he was being framed by Tabor and terminated the

7

interview until counsel was present.  *Id.* at PageID 255.  Plaintiff was told by a neighboring inmate and his cell mate that Tabor was attempting to get another inmate to make a statement saying the package of contraband belonged to Plaintiff.  *Id.* at PageID 255–56.

On August 5, 2021, Plaintiff asserts Tabor wrote up a conduct report that Plaintiff brought contraband into the prison.  *Id.* at PageID 255.  On August 10, 2021, Tabor terminated Plaintiff's visitation privileges for "no" reason, to which Plaintiff filed another an informal complaint against Tabor.  *Id.* at PageID 256.

On August 19, 2021, Plaintiff was found guilty of bringing contraband into the prison and was placed in segregation for 180 days along with a "security review," which he appealed, arguing Tabor's actions were in retaliation for filing grievances against Tabor and Weishar.  *Id.* at PageID 256–57.  Instead of a regular security review, Plaintiff was given a "S.M.P." hearing,[8] resulting in him being placed in "extended restrictive housing" for two years "outside of the original 180 days." *Id.* at PageID 258.

On November 16, 2021, Plaintiff was informed by mail room staff Edwards that he had mail from an attorney Gregory Robey, but that the "K-9" team "hit" on the mail resulting in the mail being held, and Plaintiff had to make a choice of sending it back or allowing further review by prison staff.  *Id.* at PageID 259.  Plaintiff alleges he chose further review, resulting in the mail being reviewed and confiscated by Tabor as he classified it as containing contraband in the form of 45 pages of thick cotton paper with an unknown substance on it.  *Id.*  Plaintiff claims Tabor instructed Edwards to write a false conduct report about the contraband.  *Id.*

---

[8] The Court believes "SMP" references the "serious misconduct panel" referenced in Ohio Administrative Code 5120-9-08(L)(3).

Plaintiff immediately challenged the conduct report written by Edwards, resulting in him going before the RIB on November 29, 2021, where Plaintiff again accused Tabor of fabricating the information contained in the report.  *Id.* at PageID 260.

The day after the hearing Plaintiff was told he was being taken to mental health but when he exited his cell he was grabbed by Tabor and several other officers and strip searched in the C/O's restroom while his cell was searched.  *Id.*  After the search was complete Tabor informed Plaintiff he was taking his phone and address book to restrict Plaintiff from communicating with anyone outside of the prison.  *Id.* at PageID 261.  Plaintiff immediately wrote a complaint about Tabor when he returned to his cell regarding the continued harassment and searches and submitted the complaint to investigator Sparks, but again received no response.  *Id.*

Plaintiff alleges he was again strip searched and his cell was searched on December 29, 2021, by two officers sent by Tabor.  Again, the following day a conduct report was issued accusing Plaintiff of possession of an intoxicating substance, which Plaintiff alleges was actually Kool-Aid.  *Id.*  The conduct report was referred to RIB for review, and instead of investigating the content of the substance at issue, Plaintiff alleges he was given sanctions without a hearing.  *Id.* at PageID 262.

Plaintiff was taken to administration on December 30, 2021, where he was met and questioned by Tabor and investigator Kerns about providing information regarding which correctional officers were bringing contraband into the prison.  *Id.*  Plaintiff alleges he refused and asked for them to stop calling him into the office as he was being labeled a snitch and his safety was in jeopardy.  *Id.*  Plaintiff was again taken to administration the following day, December 31, 2021, by Tabor where he was again asked to provide information regarding which correctional officers bringing contraband into the prison.  *Id.*

9

Plaintiff alleges that he was informed by several inmates on January 29, 2022, that a "hit" was put on him and that C/O Wagoneer was "in on it" as it was believed Plaintiff was providing Tabor with information about Wagoneer or other inmates bringing contraband into the prison. *Id.* at PageID 262. That same day Wagoneer placed Plaintiff and his cell mate in handcuffs and told them he was taking them to the showers, but after leaving the cell, Wagoneer walked the other way leaving Plaintiff alone with another inmate who punched Plaintiff in the face, head, and torso until Plaintiff fell to the floor, poked Plaintiff with a sharp object, and kicked Plaintiff multiple times for at least two minutes until Wagoneer yelled at him to stop. *Id.*

After the assault, Plaintiff asserts he was taken to medical, but, although he had injuries to his head and body, the only "treatment" he received was having his blood pressure checked. *Id.* at PageID 264. He was then given a paper towel to clean himself with. *Id.* No examination was performed, and Plaintiff alleges he was "left in pain" until he healed. *Id.*

Plaintiff alleges that he has written evidence from both the inmate who attacked him on January 29 and the one who threw human waste at him that they had done so at the request of Wagoneer. *Id.* at PageID 266. On February 4, 2022, Plaintiff was taken to administration where he thought he was going to speak with a police officer about the January 29 assault, but instead Tabor met him and told him inmates are not allowed to file police reports. *Id.* at PageID 264.

On February 10, 2022, Plaintiff was again assaulted by an inmate on his way back from administration when the inmate threw a container of feces and other human waste in his face, but Plaintiff was made to wait 45 minutes before being taken to medical where he believed he would be treated and decontaminated as he potentially was exposed to hepatitis and other harmful diseases. *Id.* at PageID 265. Instead, Plaintiff was given soap and a towel to wipe his face and was told he would be okay. *Id.* Later that day, and Plaintiff asserts he suffered from a fever,

diarrhea, vomiting and a loss of appetite, as a result of exposure to the body fluids from the assault. *Id.*

On February 15, 2022, during a cell "shake down" one of the lieutenants present asked Plaintiff if he was Muslim, and when he responded affirmatively, the lieutenant told him he hated Muslims and took his Holy Qur'an and his Kufi, throwing both on the floor and kicking them "as if it was trash." *Id.* Plaintiff informed the "warden" of this immediately and the warden made the lieutenant put his religious things back, but as soon as the warden left the lieutenant again kicked everything back on the floor. *Id.* at PageID 267. Plaintiff alleges he asked officer Collins, who was overseeing the shake down, for an informal complaint so he could document the incident with his religious items, but his request was denied. *Id.*

On February 16, 2022, Plaintiff was informed he was being transferred to another prison which turned out to be OSP. *Id.* When he inquired about the transfer of his personal property, he was told his property was already packed by Collins and Tabor personally, which Plaintiff alleged was unusual. *Id.*

Upon arrival at OSP Plaintiff took "inventory of his property" and immediately noticed most of his personal property listed on his personal property receipt dated July 21, 2021, when he was placed into segregation at LeCI, was missing, and included in his property was a J-P6 tablet that did not belong to him. *Id.* at PageID 268. Plaintiff listed the following personal property as missing: sheets, reading glasses, a "mini pocket studio," an "I-Fly Amp," a J-P5 tablet, plug-and-play Playstation, a watch, a prayer rug and kufi, and various articles of clothing. *Id.* He also reviewed the property record receipt dated February 15, 2022, which was signed by Collins and which Plaintiff alleges, falsely indicated Plaintiff had refused to be present for his property pack-up. *Id.* at PageID 268–69.

11

After Plaintiff was checked into OSP he went through his property and discovered that the second J-P6 tablet that did not belong to him was missing the security screws and the battery was not lying flat. *Id.* at PageID 269. Upon opening the back Plaintiff saw a cell phone inside, and he became suspicious he was either being set up by Tabor or he was mistakenly given another inmate's property. *Id.* at PageID 270–71.

On April 14, 2022, a member of the "S.T.G. unit" found (or Plaintiff told them that he had) the tablet with the cell phone in it and Plaintiff informed them that Tabor had placed it there. *Id.* As a result of the cell phone's presence, Plaintiff was placed in 30-day administrative segregation. *Id.* at PageID 271. Plaintiff alleges that he received letters from several inmates who were still at LeCI who indicated Tabor had bragged he was going to get Plaintiff placed in segregation at OSP over a "phone" and that Tabor was going to make it his mission in life to keep Plaintiff in prison for another ten years due to bringing contraband into LeCI. *Id.*

Plaintiff alleges he was indicted for the contraband in the Warren County Court, the counts were dismissed March 29, 2023.[9] *Id.*

Plaintiff asserts he was transported back to LeCI on July 12, 2022, for an undescribed court hearing, and upon arrival he was immediately placed into segregation at Tabor's request. *Id.* at PageID 272. Plaintiff alleges the cell he was placed in was "filthy, unsafe, and in a hazard[ous] condition . . . [containing] a strong smell of human waste and dead mice . . . [and] was also infested with mice and roaches and over flowed with toxic water was on the floor from the toilet," which, along with the sink, was to unsanitary to touch, but Plaintiff was denied cleaning products when they were requested. *Id.* Plaintiff also alleges he was left without a mattress for several hours and

---

[9] Plaintiff does not provide any additional detail regarding the Warren County Court case in his Complaint. It appears this case may relate to the August 2021 indecent where Plaintiff asserts he was "read his rights" by an Ohio State Patrol Officer. *See Id.* at PageID 254–55.

was not able to shower for the "days" he was there.  *Id.*  Plaintiff immediately sent a "kite" to the ODRC director, but the director responded a week later saying the issue was moot as Plaintiff was no longer at LeCI and had returned to OSP.  *Id.*

Plaintiff alleges that at OSP investigator Ritz continued the pattern of Plaintiff's harassment, instituting "targeted" searches of Plaintiff's cell beginning on or about February 23, 2023.  *Id.*  After the February 23 search Plaintiff alleges Ritz confiscated all of Plaintiff's books, legal mail, notebooks, and JPay pictures of Plaintiff's family, without any justified reason, and without following prison policy.  *Id.* at PageID 272–73.  Eventually Plaintiff filed a kite requesting the return of his property, which Ritz refused.  *Id.* at PageID 273.  Plaintiff then filed an informal complaint to Warden Bracy regarding Ritz, informing Bracy of Ritz's harassment and the removal of his property without reason, in violation of prison policy.  *Id.*  Bracy responded a week later but did not investigate any of Plaintiff's claims, instead justifying the removal of Plaintiff's property due to Ritz's claims that Plaintiff violated an administrative rule. *Id.* at PageID 274 Plaintiff alleges that Bracy's acquiescence of Ritz's behavior is simply an approval of the harassment tactics of the officers that she supervises.  *Id.*

On or about May 2, 2023, Plaintiff alleges he was placed in segregation at the request of investigator Ritz, allegedly due to something Plaintiff said or did over the phone on April 28, 2023. *Id.* at PageID 275–76.  Two days later Plaintiff asserts he was issued a conduct report signed by Ritz claiming Plaintiff intimidated a witness in a pending criminal case and for the "furtherance of criminal activity."  *Id.* at PageID 276.  Plaintiff submits that the alleged criminal activity at issue was his advice to his daughter to not speak to law enforcement regarding an investigation into something happening outside of the prison.  *Id.* at PageID 277.  Plaintiff filed a complaint to Warden Bracy on May 4, 2023, regarding Ritz's behavior, including Ritz's wrongful segregation

13

of Plaintiff and Ritz's continued harassment in violation of prison policy.  *Id.* at PageID 277–78.  Bracy responded, again "justify[ing]" Ritz's actions and failing to address Plaintiff's policy allegations.  *Id.*

Plaintiff appealed and on May 11, 2023, he went before the RIB, which was conducted by Lieutenant Santha and Captain Drummond, challenging the reports as fabricated for harassment purposes, detailing Ritz's malicious conduct towards him, and arguing that he could prove himself innocent of the violations if he had access to phone recordings and chemicals for testing.  *Id.* at PageID 279–80.   Plaintiff further requested Ritz be present and to answer questions about the "falsified" conduct report, but his answers were vague and made little sense.  *Id.* at PageID 280.  Plaintiff alleges those requests were denied.  *Id.* at PageID 280.  He further asserts the RIB did not listen to the recordings, which Ritz claimed were in his office, and found Plaintiff guilty, sanctioning him to 29 days of segregation, with the loss of all privileges including phone privileges.  *Id.* at PageID 281.  Plaintiff alleges that after the hearing Ritz apologized to him, indicating the things that were being done to Plaintiff were "above his head" and showed Plaintiff text messages on his personal phone that indicated Plaintiff had done nothing wrong and that other agencies knew it.  *Id.* at PageID 281–84.

Following the hearing Plaintiff filed an appeal with the assistant Warden Thomas Horten, informing him of the lack of evidence to support the violations Plaintiff was found guilty of and the absence of the required written record of the disposition.  *Id.* at PageID 284–85.  Horten responded, justifying the outcome by stating he reviewed the evidence in the investigator's office.  *Id.* at PageID 285.

14

The Court liberally construes Plaintiff's claims as follows:[10]

1.     Failure to provide or appropriately utilize an adequate prison grievance system against defendants Myers, Harris, Sparks, Bracy, Collins, and Horten.

2.     Failure to follow prison rules and regulations against all defendants.

3.     Fourteenth Amendment procedural due process claims involving:

(a) the procedures used in prison disciplinary proceedings against him and the resulting sanctions against Tabor, Weishar, Koontz, Santha, Drummond, Liming, Chambers-Smith, Harris, Myers, Barcy, Weishar, Horton, and Ritz;

(b) denial of medical treatment against John Doe Medical Department;

(c) taking of personal property Ritz, Collins, and Tabor; and

(d) placement in administrative segregation by Ritz, Weishar, Tabor, Koontz, Santha, Drummond, and Liming.

4.  Fourth Amendment malicious prosecution against Weishar and Tabor.

5.  Fourth Amendment search and seizure against Ritz, Collins, and Tabor.

6.  Substantive Due Process involving seizure and opening of legal mail against Chambers-Smith, Ritz and Tabor

7.  First Amendment retaliation and harassment against Weishar, Tabor, Ritz, and Collins

8.  Eighth Amendment Cruel and unusual punishment including: (a) failure to protect against Tabor, Waggoner, Weishar, (b) deliberate indifference to medical needs against John Doe Medical, and (c) conditions of confinement against Tabor, Harris and Weishar.

9.  Civil Conspiracy against all defendants.

---

[10] The Court notes that many claims and the connections to various defendants were constructed by this Court due to Plaintiff's Complaint being over 100 pages, naming 16 parties as defendants, and the potential connection of alleged facts to multiple claims.

10. Respondeat superior against Harris, Chambers-Smith, and Bracy.

Plaintiff seeks injunctive, declaratory, and monetary relief, including return of good time credits, removal from segregation, replacement of Plaintiff's personal property, creation of and enforcement of prison policy, and payment of $700,000 in compensatory damages from various defendants. *Id.* at PageID 317–53.

## II. STANDARD

Because Plaintiff is a prisoner seeking "redress from a governmental entity or officer or employee of a governmental entity," the Court is required to conduct an initial screen of his Complaint. 28 U.S.C. § 1915A(a), (b). The Court must dismiss the Complaint, or any portion of it, that is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b).

A complaint is frivolous if the plaintiff cannot make any claim with a rational or arguable basis in fact or law. *Neitzke v. Williams*, 490 U.S. 319, 328-29 (1989); *see also Lawler v. Marshall*, 898 F.2d 1196, 1198 (6th Cir. 1990). An action has no arguable legal basis when the defendant is immune from suit or when plaintiff claims a violation of a legal interest which clearly does not exist. *Neitzke*, 490 U.S. at 327. An action has no arguable factual basis when the allegations are "fantastic or delusional," *Hill v. Lappin*, 630 F.3d 468, 471 (6th Cir. 2010), or "clearly irrational or wholly incredible." *Ruiz v. Hofbauer*, 325 F. App'x 427, 429-30 (6th Cir. 2009) (citing *Denton v. Hernandez*, 504 U.S. 25, 33 (1992)).

To state a claim for relief, a complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Court must construe the complaint in plaintiff's favor, accept all well-pleaded factual allegations as true, and evaluate whether it contains "enough facts to state a claim to relief that is plausible on its face."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A complaint that consists of mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" is insufficient. *Id*. (quoting *Twombly*, 550 U.S. at 555).

In the interest of justice, this Court is required to construe a pro se complaint liberally and to hold it "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) and citing Fed. R. Civ. P. 8(f)). Even with such a liberal construction, however, a pro se complaint must still adhere to the "basic pleading essentials." *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989). Specifically, a pro se "complaint 'must contain either direct or inferential allegations respecting all the material elements' to recover under some viable legal theory.'" *Barhite v. Caruso*, 377 F. App'x 508, 510 (6th Cir. 2010) (quoting *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)).

### III. RECOMMENDATIONS ON INITIAL REVIEW

Section 1983 allows an individual to sue any "person" who, while operating under color of state law, subjected that individual to a deprivation of his constitutional rights. 28 U.S.C. § 1983. However, "neither a State nor its officials acting in their official capacities are 'persons' for purposes of § 1983 liability." *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989) (explaining that an official capacity suit against a state official is no different from a suit against the state itself). Therefore, when an individual state actor is sued in his or her official capacity, "in all respects other than name, [the suit or claim is] to be treated as a suit against the entity." *Ky. v. Graham,* 473 U.S. 159, 166 (1985).

17

Here, as Plaintiff sues all defendants in their official and individual capacities, Doc. 17 at PageID 238–40, this Court will evaluate all claims against all defendants under both official and individual capacity standards in this section. However, as the Court has determined some claims and remedies cannot proceed regardless of capacity, in an attempt at brevity, this Court will first address those matters and then turn to the capacity analysis.

## A. Unavailable Claims and Relief Regardless of Capacity

### 1. Claims relating to prison grievance procedures

Plaintiff alleges that defendants Myers, Harris, Sparks, Bracy, Collins, and Horten failed to provide access to grievances, failed to respond to or investigate Plaintiff's grievances, and/or failed to provide responses to Plaintiff's grievances in a method in which Plaintiff could access. Doc. 17 at PageID 243–44, 249, 254–55, 261, 267, 274, 278, 285–86, 328, 326–37, 338–39. Plaintiff, however, has no constitutionally protected right to an effective prison grievance procedure regardless of the substance of Plaintiff's complaints. *Young v. Gundy,* 30 Fed. Appx. 568, 569–70 (6th Cir. 2002), citing *Antonelli v. Sheahan,* 81 F.3d 1422, 1430–31 (7th Cir. 1996)); *see also Argue v. Hofmeyer,* 80 Fed. Appx. 427, 430 (6th Cir. 2003); *Keenan v. Marker,* 23 Fed. Appx. 405, 407 (6th Cir. 2001); *Mays v. Wilkinson,* 181 F.3d 102 at *1 (6th Cir. 1999); *Hewitt v. Helms,* 459 U.S. 460, 467 (1983).

While an inmate is entitled to pursue redress in the federal courts, if he wishes, for his underlying constitutional claims, he cannot complain about the procedures in which a state's corrections system followed or failed to follow in evaluating his grievance. *See Israfil v. Parks*, 2010 WL 4642978, at *1 (S.D. Ohio 2010). Put another way, prison officials are not obligated to respond to an inmate's grievances in a way satisfactory to the inmate or to provide a grievance system. *Overholt v. Unibase Data Entry, Inc.,* 221 F.3d 1335, *3 (6th Cir. 2000).

Therefore, to the extent Plaintiff seeks to bring claims against defendants Myers, Harris, Sparks, Bracy, Collins, and Horten relating to Plaintiff's access to (or denial of access to) the prison grievance system or the particular procedures utilized to evaluate his grievances, this Court **RECOMMENDS** those claims be **DISMISSED without prejudice** for failure to state a claim on which relief may be granted.

### 2. Relief - Discipline of prison officials

The Supreme Court has explained that "42 U.S.C. § 1983 creates a species of tort liability where the basic purpose of § 1983 damages is to *compensate persons for injuries* that are caused by the deprivation of constitutional rights. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 305–07 (1986). Not all types of relief, however, are available in a § 1983 action including orders for prison official discipline.

Plaintiff requests that the Court order defendants Chambers-Smith, Bracy, and Harris to reprimand, terminate or take other undisclosed action against various prison officials under their command as punishment for their alleged wrongful behavior. Doc. 17 at PageID 274, 277, 323, 343–44. However, the Court has no authority to discipline prison officials in a § 1983 action regardless of the capacity a state official is sued under. *See, e.g., Street v. Rodriguez*, No. 2:12-CV-13995, 2014 U.S. Dist. LEXIS 27376 at *13-14 (E.D. Mich. Feb. 7, 2014) ("An order that [prison] officials impose sanctions on an employee or specify the conditions under which the employee should be employed 'unnecessarily intrudes on [the prison's] operations' and is 'an inappropriate use of the court's equity powers.'") (quoting *LaMarca v. Turner*, 995 F.2d 1526, 1543 (11th Cir. 1993); *Ross v. Reed*, No. 1:13-cv-143, 2013 WL 1326947 at *2, 2013 U.S. Dist. LEXIS 44697 at *5-6 (S.D. Ohio Mar. 5, 2013)) ("[T]o the extent plaintiff seeks injunctive relief in the form of an order requiring that disciplinary ... proceedings be initiated against the defendants,

the complaint fails to state an actionable claim" because "[t]he Court has no authority under § 1983 to direct the ... police department to initiate any disciplinary proceedings against its employees...."); *Theriot v. Woods*, No. 2:09-cv-199, 2010 WL 623684 at *4, 2010 U.S. Dist. LEXIS 14253 at *10-11 (W.D. Mich. Feb. 18, 2010) (dismissing claim for "punitive injunctive relief" on the ground that the court could not issue an order directing prison officials to discharge defendants from their jobs as prison employees because such relief is "not available under [ ] § 1983" and the court "has no authority under [ ] § 1983 to ... terminate the employment of [the defendants.]").

For the foregoing reasons, **IT IS RECOMMENDED** that any and all claims seeking injunctive or declaratory relief in the form of seeking disciplinary action or termination of prison employees by Chambers-Smith, Bracy and Harris be **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 3. Claims and Relief – Failure to follow prison rules and regulations

Plaintiff's Complaint is replete with claims against all defendants for allegedly violating prison rules, see Doc. 17 at PageID 317–41, and as relief Plaintiff seeks an order requiring Defendant Chambers-Smith, Harris and Myers to enforce existing prison administrative rules and policies, *id.* at PageID 323, 342. These claims (and related relief sought) should fail as courts in other circuits have explained, prisoners do not have a federal statutory or constitutional right to enforce prison officials' compliance with prison policies. *See e.g. Phillips v. Norris*, 847 (8th Cir. 2003). This is so as "there is no federal constitutional liberty interest in having state officers follow state law or prison officials follow prison regulations." *Id.* (citing *Kennedy v. Blankenship,* 100 F.3d 640, 643 (8th Cir. 1996)). Instead, "any liberty interest must be an interest in the nature of

20

the prisoner's confinement, 'not an interest in the procedures by which the state believes it can best determine how he should be confined.'" *Id.* (quoting *Blankenship*, 100 F.3d at 643).

As such, **IT IS RECOMMENDED** that Plaintiff's claims against all defendants for violations of prison rules and policy and for injunctive relief seeking and order that defendants Chambers-Smith, Harris, and Myers enforce various existing prison regulations be **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 4. Prison "medical department" cannot be sued under § 1983

"[A] state prison's medical department is not a 'person' within the meaning of § 1983." *See Hix v. Tennessee Dept. of Corrections*, 196 Fed. Appx. 350, 355 (6th Cir. 2006) (collecting cases). To the extent Plaintiff attempts to sue John Doe Medical Department, his claims cannot proceed. **IT IS THEREFORE RECOMMENDED** that Plaintiff's claims against John Doe Medical Department be **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 5. Claims arising before August 15, 2020, are barred

It is well-settled that, the appropriate statute of limitations for 42 U.S.C. § 1983 civil rights actions arising in Ohio requires any claims to be filed within two years after their accrual. *See LRL Properties v. Portage Metro Housing Auth.*, 55 F.3d 1097, 1105 (6th Cir. 1995); *Fuller v. Cuyahoga Metro. Housing Auth.*, 2007 WL 987309, at * 3 (N.D. Ohio Apr. 2, 2007) (citing *Browning* for the proposition that, "the statute of limitations for filing a federal § 1983 claim is determined by state law; in Ohio, the period is two years").

Here, Plaintiff signed and dated his Complaint on August 15, 2022, and it was received on August 17, 2022.  Doc. 1.  Applying the two-year statute of limitations applicable to § 1983 in Ohio, any claims which accrued prior to August 15, 2020, are barred and should be dismissed.

Plaintiff appears to allege claims arising from incidents occurring both on August 3, 2020, and August 10, 2020, which are barred by the two-year statute of limitations applicable to § 1983 claims.  **IT IS THEREFORE RECOMMENDED** that any of Plaintiff's claims accruing prior to the August 15, 2020, including any claims arising from the August 3 and August 10, 2020, factual allegations be **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### B.  Official Capacity

"While '[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law,' individuals sued in their official capacities stand in the shoes of the entity they represent."  *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)).  As stated above, "[a] suit against an individual in his official capacity is the equivalent of a suit against the governmental entity" and is therefore no different from a suit against the state itself.  *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 68 (1989)).  However, whether a suit against State officials in their official capacity is deemed to be against the State does depend on whether a plaintiff seeks "retroactive" or "prospective" relief.  *Edelman v. Jordan,* 415 U.S. 651, 668–69 (1974).

22

Here all defendants are employed by the State of Ohio.[11]  Therefore, any claims against any defendant in an official capacity seeking monetary damages for past violations would be construed as claims against the state of Ohio.

For the reasons set forth below this Court **RECOMMENDS** all claims against all defendants *in their official capacities* be **DISMISSED without prejudice.**

### 1.  Relief – Monetary Damages

An official-capacity claim for retroactive relief compensates a plaintiff for a past violation of his legal rights and is deemed to be against the State whose officers are the nominal defendants. *Doe v. Wigginton*, 21 F.3d 733, 736–37 (6th Cir. 1994).  Therefore, where "state officials are being sued for money damages in their official capacity, the Eleventh Amendment is squarely in play as a bar to suit in federal court, at least to the extent that [p]laintiffs are bringing claims under 42 U.S.C. § 1983" as the relief sought is retroactive relief.  *Lee Testing & Eng'g, Inc. v. Ohio Dep't of Transp.,* 855 F. Supp. 2d 722, 725 (S.D. Ohio 2012).

> It is well settled that 42 U.S.C. § 1983 does not abrogate Eleventh Amendment immunity.  *See generally Quern v. Jordan,* 440 U.S. 332 (1979).  And the State of Ohio has not waived its immunity from suits for money damages, except to the extent that such claims are allowed to be brought in the Court of Claims of Ohio.  *See* R.C. 2743.03. Ohio has not waived its Eleventh Amendment immunity from suits for money damages in federal court.  *See Turker v. Ohio Dept. of Rehab. and Corrections,* 157 F.3d 453, 457 (6th Cir. 1998).

*Id.* at 725–26; *see also Kentucky v. Graham*, 473 U.S. 159, 167 n.13 (1985) (punitive damages are not available in an official capacity claim).

---

[11] GCI, LeCI and OSP are part of the Ohio Department of Rehabilitation and Correction's network of facilities.  *See* Ohio Department of Rehabilitation and Correction, *Facilities*, available at: https://drc.ohio.gov/about/facilities (last accessed Dec. 2, 2023).

Accordingly, as all remaining defendants are state employees, this Court **RECOMMENDS** all claims for money damages against all defendants *in their official capacities* be **DISMISSED with prejudice** as barred by the Eleventh Amendment.

### 2. Injunctive and declaratory relief

Here, in additional to monetary damages, Plaintiff also seeks declaratory relief against each defendant in their official capacity, as well as injunctive relief against Chambers-Smith, Bracy, Tabor, Ritz, Santha, Drummond, and Horten in their official capacity. Doc. 17 at PageID 317–45.

Under the *Ex parte Young* exception, a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law, *Ex Parte Young,* 209 U.S. 123, 150–60 (1908); *Will v. Mich. Dept. of State Police,* 491 U.S. 58, 71 & n. 10 (1989), regardless of whether compliance might have an ancillary effect on the state treasury, *Edelman v. Jordan,* 415 U.S. 651, 667–68 (1974); *Doe v. Wigginton,* 21 F.3d 733, 737 (6th Cir. 1994). Put another way, the Eleventh Amendment does not provide an automatic bar to injunctive or declaratory relief against state officials in official capacity suits. However, to the extent Plaintiff seeks declaratory relief purely concerning a defendant's past behavior, such relief remains barred. *Cf. Doe v. Wigginton,* 21 F.3d 733, 737 (6th Cir.1994) (finding that the Eleventh Amendment does not bar "prospective relief [that] compels the state officers' compliance with federal law in the future").

Here, although Plaintiff seeks declaratory relief against all defendants, *see* Doc. 17 at PageID 317–41, the only declarations sought by Plaintiff that do not solely address past behavior are against defendants Harris, Chambers-Smith, and Bracy. Doc. 17 at PageID 323, 332, 334–36, 338. Accordingly, this Court **RECOMMENDS** any and all claims for declaratory relief against all defendants *in their official capacities* relating only to a defendants' past behavior be **DISMISSED with prejudice** as barred by the Eleventh Amendment.

24

Even where prospective relief is sought, to state an official-capacity claim for injunctive or declaratory relief against a state official under Section 1983, "a plaintiff must show a direct causal link between the alleged constitutional violation and an official policy or custom adopted with 'deliberate indifference' toward the constitutional rights of persons affected by the policy or custom." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To establish such a causal link, a plaintiff must "identify the policy, connect the policy [at issue] to the [entity] itself and show that the particular injury was incurred because of the execution of that policy." *Casey v. Parker*, 2020 WL 5424075, at *2 (M.D. Tenn. 2020) (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (internal citation omitted)). The custom or policy must also be "the moving force" behind the deprivation of the plaintiff's rights. *Powers v. Hamilton Cty. Pub. Defender Comm'n*, 501 F.3d 592, 606–07 (6th Cir. 2007) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Here Plaintiff's claims fall short of making such a connection.

One incident does not make a policy or custom. Allegations relating to an incident must include more than a conclusory statement that the incident is part of a greater policy or custom, and that the unconstitutional policy can be attributed to a policymaker. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 824 (1985); *see also Nolen v. City of Chicago*, 1998 WL 111675, at *6 (N.D. Ill. 1998) (explaining that claims cannot proceed which do not contain specific policy or custom allegations). Only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

Here, Plaintiff concludes that defendant Harris created a policy and custom of allowing correctional officers to violate prison policies, procedures, and prison rules and allowing harassment and retaliation. Doc. 17 at PageID 323. Specifically, Plaintiff alleges that on one

25

occasion Harris allowed his officers to place Plaintiff in a filthy cell containing rats, an unusable toilet, and other unsanitary conditions. *Id.* at PageID 323, 332.  He alleges Chambers-Smith created a policy and custom of allowing her officers to open legal mail outside of an inmate's presence, allowing officers to violate prison policies and administrative rules relating to the determination of credibility in prison disciplinary proceedings, and allowing officers to punish inmates for having contraband without requiring said contraband to be sent to outside labs for testing, resulting in "ongoing misconduct and continuous method[s] of needless[ ] forms of harassments" of inmates *Id.* at PageID 334, 335, 336.  He also alleges that Bracy has created a policy and custom of due process denials without the informal complaint process, grievance process, and disciplinary hearing process. *Id.* at PageID 338.

However, in no instance does Plaintiff allege how the various allegations relating to him are causally connected to a *policy or procedure*.  To the contrary, Plaintiff seems to allege generally that nobody follows policies in the prison system, indicating that if anything, the policy or custom at issue is a generalized failure by prison staff to follow existing policies and a lack of enforcement by prison officials.  Therefore, because Plaintiff does not allege that the defendants acted pursuant to a policy or custom that could be attributable to the state, and as previously discussed this Court is unable to require enforcement of existing prison policies, Plaintiff fails to state a claim of any nature against the state officials in their official capacity.

Accordingly, this Court **RECOMMENDS** any and all claims for prospective declaratory and injunctive relief against all defendants including Chambers-Smith, Harris, and Bracy *in their official capacities* be **DISMISSED without prejudice**.

26

## C.  **Individual Capacity**

In addition to alleging a violation of federal constitutional or statutory law by a person acting under color of law, to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that he suffered a specific injury resulting from the conduct of a particular defendant and he must allege an affirmative link between the alleged injury and the conduct of that defendant.  *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

Here, Plaintiff alleges various First, Fourth, Eighth, and Fourteenth Amendment violations as well as what the Court construes as a civil conspiracy claim against multiple defendants in their individual capacities.  Each group of claims shall be addressed in conjunction with the facts supporting those claims as they relate to each defendant in the following sections.

### 1.  **14th Amendment – Procedural Due Process**

Throughout his Complaint Plaintiff sets forth multitudes of what he deems Fourteenth Amendment procedural due process violations relating to the procedures used in prison disciplinary proceedings against him and the resulting sanctions against various defendants.  *See* Doc. 17.

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law...." U.S. CONST. amend. XIV, § 1.  "The Due Process Clause has a procedural component and a substantive one. The two components are distinct from each other because each has different objectives, and each imposes different constitutional limitations on government power."  *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996).

To establish a procedural due process violation under 42 U.S.C. § 1983, a plaintiff is required to demonstrate three elements:

> (1) that [he] had a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that [he] was deprived of that protected

27

interest within the meaning of the due process clause; and (3) that the [defendants] did not afford [him] adequate procedural rights before depriving [him] of [his] protected interest.

*Wedgewood Ltd. P'ship I v. Twp. of Liberty, Ohio*, 610 F.3d 340, 349 (6th Cir. 2010).  Importantly, "[i]f a plaintiff cannot establish that a life, liberty, or property interest exists, then there can be no correlating due process violation" and the remaining elements need not be considered.  *Howard v. Mgmt. & Training Corp.*, No. 13-3443, 2014 WL 12971771, at *2 (6th Cir. 2014).

### a. *Sanctions involving unprotected interests*

Plaintiff alleges the following sanctions resulting from allegedly deficient prison disciplinary proceedings were unconstitutionally conferred without due process: (1) Termination of visitation privileges (against Tabor, Weishar, Koontz, Santha, Drummond, Liming); (2) Transfer to another institution (against Weishar); (3) Reclassification of offender status (against Weishar); and (4) Loss of ability to earn good time credits resulting from convictions of prison policy based on faulty procedure (against Tabor and Weishar, Koontz, Santha, Drummond, Liming). Doc. No. 17 at PageID 248, 256, 319–21, 326–32, 340–341.  None of these interests, however, are constitutionally protected interests to which due process would apply.

The Due Process Clause "does not protect every administrative slight that occurs behind prison walls." *Harden-Bey v. Rutter*, 524 F.3d 789, 791 (6th Cir. 2008).  The United State Supreme Court and the Sixth Circuit have addressed many common incidents of prison life, ultimately finding that they do not raise due process concerns as they do not rise to a protected liberty interest. *Id.*  These include the use of four-point restraints without the presence of a nurse, *Grinter v. Knight*, 532 F.3d 567, 574 (6th Cir. 2008), the banning or restriction of visitors, *Bazzetta v. McGinnis*, 430 F.3d 795, 802–03 (6th Cir. 2005), the designation of a prisoner as a threat to others, *Harbin–Bey v. Rutter*, 420 F.3d 571, 577 (6th Cir. 2005), increasing a prisoner's security classification,

*Workman v. Wilkinson*, 23 F. App'x 439, 440 (6th Cir. 2001), *see also Olim v. Wakinekona,* 461 U.S. 238, 245 (1983) (a prisoner has no right to a particular security level), assigning an inmate serving a life sentence to segregation without a reclassification hearing, *Rimmer-Bey v. Brown*, 62 F.3d 789, 791 (6th Cir. 1995), and the right to accrue good time credits, *Hansard v. Barrett,* 980 F.2d 1059, 1062 (6th Cir. 1992) ("The United States Supreme Court has held that inmates have no inherent constitutional right to good time credit.") (citing *Wolff v. McDonnell,* 418 U.S. 539, 557 (1974)); *see also Luken v. Scott,* 71 F.3d 192, 193-94 (5th Cir. 1995) (per curiam), *cert. denied.* 517 U.S. 1196 (1996) (although a disciplinary conviction may impact a prisoner's future ability to earn good time credits leading to earlier parole, such speculative, collateral consequences of a prison disciplinary conviction are insufficient to create a liberty interest).  The Supreme Court has also found no liberty interest is implicated when an inmate is moved from incarceration in one institution to incarceration another, and therefore no Fourteenth Amendment Due Process claim arises from such a transfer.  *Meachum v. Fano*, 427 U.S. 215, 225 (1976).

As Plaintiff has no constitutionally protected interest in visitation privileges, the location of his incarceration, the classification of his offender status, or the ability to earn good time credits, the Court **RECOMMENDS** that Plaintiff's due process claims against defendants Tabor, Weishar, Koontz, Santha, Drummond, and Liming for termination of visitation privileges, against defendant Weishar for transfer to another institution and for reclassification of offender status, and against defendants Tabor, Weishar, Koontz, Santha, Drummond, and Liming for loss of ability to earn

29

good time credits be **DISMISSED without prejudice** for failure to state a claim on which relief may be granted.

### b. *No due process interest in medical treatment*

Plaintiff also alleges that he was denied due process of law under the Fourteenth Amendment by defendant John Doe Medical Department after he presented to the medical office covered in human waste but was denied decontamination treatment resulting in his becoming severely ill. Doc. 17 at PageID 333. While, as previously discussed, claims cannot proceed against a prison medical department as it is not a person within the meaning of § 1983, s*ee Hix*, 196 Fed. Appx. at 355, even if Plaintiff were to be granted leave to amend his complaint to name an individual in the LeCI medical department as a defendant, those claims would also fail under due process analysis, as they may only proceed under the Eight Amendment in Plaintiff's circumstances.[12]

While the Supreme Court has recognized a constitutional obligation to provide medical care to incarcerated persons, *see, e.g.*, *Estelle*, 429 U.S. at 104; *Rhinehart v. Scutt*, 894 F.3d 721, 736–37 (6th Cir. 2018); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004), Eighth Amendment claims alleging deliberate indifference to medical needs only fall under the Fourteenth Amendment's due process protection when the incarcerated person is a pretrial detainee. *See Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 566 (6th Cir. 2020) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (explaining that following arrest and before

---

[12] The Court construes this claim as one more appropriately brought under the Eighth Amendment and shall address it as such *infra*.

adjudication of guilt, due process rights to medical care for pretrial detainees "are at least as great as the Eighth Amendment protections available to a convicted prisoner")).

As Plaintiff is not a pretrial detainee, this Court **RECOMMENDS** that all Fourteenth Amendment claims alleging due process violations for alleged denial of medical care should be **DISMISSED with prejudice** for failure to state a claim on which relief may be granted.

### c. *Prison disciplinary proceeding procedure*

Plaintiff alleges the following due process violations against defendants Chambers-Smith, Harris, Myers, Barcy, Weishar, Tabor, Horton, Koontz, Santha, Drummond, Liming, and Ritz occurring in conjunction with various prison disciplinary proceedings brought against him: Failure to follow prison rules and regulations governing prison disciplinary proceedings (or allowing a custom of allowing such violations), including proper investigation of claims, testing of substances, allowing cross-examination of witnesses, making credibility determinations regarding witness statements, as well as failing to be fair and impartial, failing to review evidence presented by Plaintiff, relying on false evidence resulting from "external peer pressure from high ranking officials," and making evidentiary findings and findings of guilt without Plaintiff's presence. Doc. 17 at PageID 258, 262, 286, 320, 322–25, 334–37, 338–39. None of these claims should proceed.

The United States Supreme Court has recognized that "a governmental decision resulting in the loss of an important liberty interest violates due process if the decision is not supported by any evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (U.S. 1985). However, "prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell*, 418 U.S. 539, 556, 564–71 (1974) (citing *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). Instead, inmates enjoy a very narrow set of due process rights when prison authorities institute disciplinary

31

proceedings.  *See e.g. Cleavinger v. Saxner*, 474 U.S. 193 (1985) (disciplinary board members protected by qualified immunity); *Ponte v. Real*, 471 U.S. 491, 495–99 (1985) (disciplinary board need not make contemporaneous record of reasons live witnesses for inmate not allowed).

Ascertaining whether due process is satisfied in the context of prison disciplinary proceedings "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455–56 (citations omitted).  If the answer is "yes," then due process is satisfied. *Id.*

As pleaded, none of Plaintiffs' claims relating to process allegedly due to him at various disciplinary proceedings should proceed.  Plaintiff's position is not that there was no evidence against him when finding him guilty at various prison proceedings.  Instead, Plaintiff's position is that the evidence against him, whether statements from prison officials, other inmates, or contraband drugs, were manufactured and/or unverified, and he was not provided opportunity to rebut or otherwise contradict the evidence against him.  Due process does not guarantee such procedure in the prison disciplinary context.

As such, to the extent Plaintiff seeks to bring a due process claim against defendants Chambers-Smith, Harris, Myers, Barcy, Weishar, Tabor, Horton, Koontz, Santha, Drummond, Liming, Ritz, relating to Plaintiff's limited access to (or denial of access to) the procedures and processes relating to adjudication of disciplinary proceedings against him, this Court **RECOMMENDS** those claims be **dismissed without prejudice** for failure to state a claim on which relief may be granted.

### d. *Taking of personal property*

Plaintiff's claims that his personal property was taken by Ritz, Collins, and Tabor during multiple searches of Plaintiff's cell, that Collins failed to inventory Plaintiff's property in Plaintiff's presence prior to the property being taken, and that some of Plaintiff's property was lost or destroyed as a result, violated his Fourteenth Amendment right to due process.[13]   Doc. No. 17 at PageID 328.

As an initial matter, it is unclear why Plaintiff believes his lack of presence at the inventory of his personal property performed by Collins on February 15, 2022, when his personal property was packaged prior to Plaintiff's institutional transfer, is a due process violation.  Doc. No. 17 at PageID 328.  To the extent Plaintiff submits he was required to be present for the inventory of his personal property under prison policy, his claim is to no avail.  *See e.g. Martinez v. Menchaca*, No. C-08-197, 2009 WL 3334896, at *8 (S.D. Tex. 2009) (denying inmates claim that the prison violated a regulation which required him to be present during inventory of his property resulted in a due process violation).  To the extent Plaintiff argues his presence is necessary to prove ownership of the missing items, presence at an inventory is not necessary as "Plaintiff could establish possession of property items via his own testimony, witness testimony, [ ] receipts, and past inventory or property forms."  *Id.*

As this Court is not aware of any inherent due process right to being present at the inventory of property while incarcerated, the Court **RECOMMENDS** that Plaintiff's due process claim against Collins relating to his alleged failure to have Plaintiff present for an inventory of the property fails to state a claim on which relief may be granted and should be **DISMISSED without prejudice**.

---

[13] Plaintiff also appears to allege this property deprivation violated his Fourth Amendment right to be free from unreasonable search and seizure.  Doc. No. 17 at PageID 328.  This claim will be addressed separately.

In relation to Plaintiff's claims that his property was taken and some of it was lost or destroyed, in violation of his right to due process, the Fourth Amendment does not protect against seizures in a prison cell, therefore prison officials are "free to seize from cells any articles which, in their view, disserve legitimate institutional interests." *Hudson v. Palmer,* 468 U.S. 517, 528 n. 8 (1984).  However, although the Fourth Amendment does not protect against seizures in a prison cell, that lack of protection "does not mean that an inmate's property can be destroyed with impunity." *Id.* Instead, under *Parratt v. Taylor*, 451 U.S. 527 (1981), a due process challenge for destruction of property can be successful where no meaningful post-deprivation state remedy such as filling out an institutional grievance or bringing a state court tort action for property loss exists or was available. *Palmer*, 468 U.S. at 528 n. 8.

Indeed, the Sixth Circuit requires a plaintiff to plead and prove that available state remedies are inadequate or systematically defective to state a claim for procedural process under §1983 for deprivation of property. *Vicory v. Walton,* 721 F.2d 1062 (6th Cir. 1983).  This is so as when an adequate post-deprivation remedy exists, the deprivation, although real,[14] is not "without due process of law." *Parratt v. Taylor*, 451 U.S. 527, 537 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986).

Here, Plaintiff alleges that personal property including sheets, reading glasses, a "mini pocket studio," an "I-Fly Amp," a J-P5 tablet, plug-and-play Playstation, a watch, a prayer rug and Kufi, and various articles of clothing were lost or taken from him by Collins and/or Tabor.  Doc. 17 at PageID 268.  He also alleges Ritz confiscated all of Plaintiff's books, legal mail, notebooks,

---

[14] It does not matter if the deprivation of property was the result of negligent or intentional actions so long as the deprivation was not done pursuant to an established state procedure. *Palmer*, 468 U.S. at 530-36.

34

and JPay pictures of Plaintiff's family, without any justified reason, and without following prison policy. *Id.* at PageID 272–73.

While Plaintiff argues that he filed prison grievances regarding his loss of property when Collins and Tabor took his property prior to transfer into segregation that were ignored, potentially indicating one post-deprivation remedy was inadequate, he does not address any other remedies available to him under Ohio law or if he pursued such remedies. *Surgenor v. Moore*, 2017 WL 928745, at *2 (S.D. Ohio 2017) (dismissing prisoner's property destruction claim as "Plaintiff has not alleged any facts even remotely suggesting that the tort remedies available under Ohio law are inadequate."); *see also Glazewski v. Corzine*, No. 06–4107, 2009 WL 5220168, at *12 (D.N.J. 2009) (explaining that a property deprivation claim must be dismissed where a plaintiff availed himself of only some of the post-deprivation remedies available to him). Under settled Sixth Circuit authority, a prisoner's failure to sustain his burden regarding the adequacy of state remedies requires dismissal of his § 1983 due-process action relating to his property claims. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

In relation to Plaintiff's allegations against Ritz, Plaintiff does allege he filed a prison grievance which was not addressed in his favor. Doc. 17 at PageID 272–73. However, Plaintiff does not indicate he attempted to pursue any other state remedies to compensate him for his damages in relation to the property taken by Ritz.

As such, this Court **RECOMMENDS** Plaintiff's due process claims against defendants Ritz, Collins, and Tabor relating to the alleged taking and in some instances loss of his personal property should be **DISMISSED without prejudice** for failure to state a claim on which relief may be granted.

35

## 5. *Administrative segregation*

Plaintiff alleges that he was placed in administrative segregation both prior to disciplinary proceedings being held and resulting from his convictions in those proceedings by defendants Ritz, Weishar, and Tabor (and presumably all defendants involved in the disciplinary proceeding brought against Plaintiff which resulted in his being placed in administrative segregation including Koontz, Santha, Drummond, and Liming, although not specifically pleaded).  Doc. 17 at PageID 242–43, 276.

Segregation of an inmate from the general prison population involves the deprivation of a state-created liberty interest protected by the Due Process Clause only if the segregation imposes an "atypical and significant" hardship on the inmate "in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483 (1995).  Confinement in administrative segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration."  *Hewitt v. Helms*, 459 U.S. 460, 467-73 (1983).  Therefore, administrative segregation is only considered atypical in "extreme circumstances," *Joseph v. Curtin*, 410 Fed. Appx. 865, 868 (6th Cir. 2010).  Generally, courts consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship." *Harden–Bey v. Rutter*, 524 F.3d 789, 794 (6th Cir. 2008).

The length of time alone, however, does not constitute an atypical and significant hardship. *See, e.g., Jones v. Baker*, 155 F.3d 810, 812-23 (6th Cir. 1998) (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot not atypical); *Mackey v. Dyke*, 111 F.3d 460 (6th Cir. 1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding did not implicate a significant hardship).  Instead, liberty interests have been implicated where

36

stays are exceptionally long, indefinite, or lack explanation.  *Cf. Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (13 years of segregation implicates a liberty interest); *Harden-Bey*, 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, *i.e.*, three years without an explanation from prison officials, implicates a liberty interest); *Harris v. Caruso*, 465 Fed. Appx. 481, 484 (6th Cir. 2012) (eight years of segregation implicates a liberty interest).

Plaintiff details several instances where he was placed into administrative segregation. First Plaintiff alleges he was placed in administrative segregation by Weishar on August 3, 2020, after he was seen associating with a fellow inmate who was intoxicated and was later found on the floor of his cell.  Doc. 17 at PageID 242.  Plaintiff submits that he was taken to segregation prior to any investigation into the August 3rd incident and that he remained there until August 10th when he was taken from his cell to a meeting with defendants Weishar, Scott and Wesson, where he was questioned about his involvement with the contraband entering the prison, including the contraband ingested by his fellow inmate on August 3rd.  *Id.* at PageID 243.  Any claims arising from the events of August 3, 2020, are subject to dismissal as barred by the statute of limitations as discussed previously.  However, even if the claim was not time-barred, such short stays are generally not considered atypical or significant for due process purposes.  *Sandin v. Conner,* 515 U.S. 472, 484 (1995) (disciplinary segregation for 30 days did not impose an atypical and significant hardship); *Rimmer-Bey*, 62 F.3d at 790-91 (placement in administrative segregation for a relatively short period of time does not require the

protections of due process); *Joseph v. Curtin*, 410 Fed. Appx. 865, 868 (6th Cir. 2010) (61 days in segregation is not atypical and significant).

As such, this Court **RECOMMENDS** Plaintiff's due process claims against defendants Weishar relating to his one week stay in segregation starting August 3, 2020, should be **DISMISSED with prejudice** as time barred and for failure to state a claim on which relief may be granted.

Plaintiff alleges a second segregation occurred on March 6, 2021, when for "no stated reason," at the request of Weishar, Plaintiff was taken to administrative segregation. Doc. 17 at PageID 243. It is unclear from the allegations in Plaintiff's Complaint how long Plaintiff remained in segregation after March 6, 2021. He alleges he filed an informal grievance regarding retaliation and harassment including his segregation by Weishar with officer Ware, which was denied, and that he remained in segregation for an undisclosed time, no longer than May of 2021 when he was transferred to LeCI. Doc. 17 at PageID 248. As Plaintiff's allegations relating to his March 6, 2021, placement in segregation lack specificity relating to how long he remained there, and as he remained there for a maximum of two and a half months, any due process claim relating to his March 2021, placement in administrative segregation should also fail for lack of alleging an atypical or significant hardship. As such, this Court **RECOMMENDS** Plaintiff's due process claims against Weishar relating to his stay in segregation starting March 6, 2021, should be **DISMISSED without prejudice** for failure to state a claim on which relief may be granted.

Finally, Plaintiff alleges that on August 19, 2021, he was placed into administration segregation for a third time for 180 days by Tabor after his transfer to LeCI, due to being found guilty of bringing contraband into the prison (a finding Plaintiff contends was based on an allegedly false conduct report written by Tabor accusing Plaintiff of violating several institutional

rules relating to bringing contraband into the prison facility).  Doc. 17 at PageID 255–57.  Plaintiff claims that during his 180 days of segregation he was given a hearing before the SMP which resulted in his being placed in "extended restrictive housing" for an additional two years.  *Id.* at PageID 257–58.  As in this instance, Plaintiff was given a reason for his segregation (a finding of guilt for bringing contraband into the facility), and multiple years of segregation following convictions for possession and distribution of illegal contraband, the term of his segregation seems within the confines of a typical period of time that does not implicate a liberty interest protected by due process.[15]

For these reasons, the Court **RECOMMENDS** that Plaintiff's due process claims against Tabor relating to his stay in segregation starting August 19, 2021, be **DISMISSED without prejudice** for failure to state a claim on which relief may be granted.

Finally, as this Court does not recommend any of Plaintiff's due process claims relating to his administrative segregation be allowed to proceed, the Court **RECOMMENDS** that Plaintiff's due process claims against against all defendants involved in the disciplinary proceedings brought against Plaintiff which resulted in his being placed in administrative segregation including Koontz, Santha, Drummond, and Liming, be **DISMISSED without prejudice** for failure to state a claim on which relief may be granted.

### 2.  Substantive Due Process – Seizure and Opening of Legal Mail

Plaintiff appears to bring a substantive due process claim against Chambers-Smith, Ritz, and Tabor, alleging that his legal mail was taken, withheld, and opened without him being present

---

[15] Moreover, it is unclear how long Plaintiff stayed in administrative segregation as the dates in which Plaintiff alleges he was placed in administrative segregation overlap.  For example, Plaintiff alleges that on August 19, 2021, he was placed in administrative segregation for 180 days, followed by two years of "restrictive" housing, but that he was also placed in administrative segregation on April 28, 2023, less than two years following his August 19, 2021, administrative segregation.  *Compare* Doc. 17 at PageID 257 *with* PageID 276.  Based on this record it is not possible to determine how long Plaintiff stayed in segregation.

in violation of his due process rights.  Specifically, Plaintiff alleges defendant Ritz seized his "legal mail" and that it was opened by defendant Tabor outside of his presence.  Doc. No. 17 at PageID 272, 273, 320, 337.  He also claims such behavior was and continues to be sanctioned by defendant Chambers-Smith.[16]  *Id.* at PageID 334–36.

The Sixth Circuit recognizes that "[t]he right of a prisoner to receive materials of a legal nature, which have impact upon or import with respect to that prisoner's legal rights and/or matters, is a basic right recognized and afforded protection by the courts...." *Kensu v. Haigh*, 87 F.3d 172 (6th Cir. 1996).  While courts have recognized that "legal mail"[17] cannot be opened outside the presence of a prisoner if that prisoner has specifically requested otherwise, *Sallier v. Brooks*, 343 F.3d 868, 877 (6th Cir. 2003), a cognizable substantive due process claim under the First Amendment for denial of access to the courts via interference with legal mail requires allegations that the prison staff conduct *affected* a prisoner's access to the courts.  *Stanley v. Vining*, 602 F.3d 767, 770 (6th Cir. 2010) (emphasis added) (citing *Pilgrim v. Littlefield,* 92 F.3d 413, 416 (6th Cir. 1996) ("In order to state a claim for denial of meaningful access to the courts, however, plaintiffs must plead and prove prejudice stemming from the asserted violation.").  In other words, a prisoner's claim for interference with access to courts through opening legal mail will fail where no prejudice to any pending litigation is alleged.  *Lewis v. Grider,* 27 Fed. Appx. 282, 283 (6th Cir. 2001).

---

[16] Plaintiff also alleges that his legal mail was held due to being suspected of containing contraband but that he agreed to further review in order to receive it, resulting in it being opened and subsequently confiscated by Tabor.  Doc. 17 at PageID 259.  As Plaintiff consented to the review by Tabor, the Court does not construe a substantive due process claim resulting from this incident.

[17] Legal mail includes "correspondence from elected officials and government agencies, including the offices of prosecuting officials such as state attorneys general" as well as court correspondence.  *Robinson v. St. Louis Corr. Facility Mailroom Staff*, No. 2:16-cv-13691, 2017 WL 7513326, at *3 (E.D. Mich. 2017) (quoting *Muhammad v. Pitcher*, 35 F.3d 1081, 1083-84 (6th Cir. 1994)).

Here, while Plaintiff's allegation that his "legal mail" was opened outside of his presence, Plaintiff does not allege any loss of access to the courts due to such alleged interference by Ritz or Tabor or that these claims could be construed against Chambers-Smith. As such, the Court **RECOMMENDS** that Plaintiff's allegations against defendants Ritz, Tabor, and Chambers-Smith relating to opening of and alleged taking of Plaintiff's legal mail should be **DISMISSED without prejudice** for failure to state a claim on which relief may be granted.

### 3. 1st Amendment – Retaliation and Harassment

Plaintiff alleges defendants Weishar, Tabor, Ritz, and Collins retaliated against him for filing prison grievances about them and other prison employees and for refusing to act as an informant in violation of his First Amendment rights.[18] Doc. 17 at PageID 243, 251, 254, 257, 277, 318, 322, 337–38.

> To establish a claim of retaliation, a plaintiff must show that:
>
> (1) he was engaged in protected conduct;[19] (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there was a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Wiley v. Kentucky Dept. of Corrections*, No. 11–97–HRW, 2012 WL 5878678, at *13 (E.D. Ky. 2012) (citing *Brown v. Crowley*, 312 F.3d 782, 787 (6th Cir. 2002))

---

[18] Although not entirely clear, it appears Plaintiff also alleges that that Myers, Harris and Sparks conspired with or were otherwise complicit in Weishar and Tabors' harassment of Plaintiff due to failing to respond to or investigate Plaintiff's grievances about Weishar and Tabors' behavior. PageID 249. However, as previously noted, there is no constitutionally protected right to a functioning grievance procedure. Therefore, to the extent Plaintiff seeks to bring a conspiracy to commit a First Amendment substantive due process violation against defendants Myers, Harris and Sparks, for failure to address his grievances or for conspiring to do so with Weishar and Tabor, for the reasons discussed *supra*, this Court **RECOMMENDS** those claims be **dismissed without prejudice** for failure to state a claim on which relief may be granted.

[19] Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, it follows that the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

An inmate has a First Amendment right to file non-frivolous grievances against prison officials. *Herron v. Harrison,* 203 F.3d 410, 415 (6th Cir. 2000). To successfully plead such a claim a plaintiff must allege that in addition to engaging in protected conduct of writing non-frivolous grievances, an adverse action was taken against him, and that Plaintiff's grievances motivated the adverse action.[20] *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Adverse actions taken in retaliation for filing grievances include "conducting harassing cell searches and confiscating an inmate's legal papers," and are not required to be "conscious-shocking" to violate the First Amendment. *Bell v. Johnson*, 308 F.3d 594, 612 (6th Cir. 2002).

Here, taken as true, Plaintiff's Complaint states a claim of retaliation under the First Amendment against Weishar, Tabor and Ritz. Plaintiff alleges that Weishar, Tabor and Ritz retaliated against him for filing prison grievances about their treatment of him after he declined to act as an informant, including frequent cell searches, strip searches, removal and/or destruction of Plaintiff's personal property, placement in segregated housing, and the filing of allegedly false conduct reports, resulting in disciplinary proceedings and other sanctions being brought against Plaintiff. Doc. 17 at PageID 243–45, 248, 250–55, 271, 277, 321–22. Plaintiff submits Tabor also planted evidence of wrongdoing on him by placing a cell phone inside of a tablet that did not belong to him when he was transferred from LeCI to OSP to immediately get Plaintiff into trouble when he arrived at OSP. PageID 271, 321. Further, Plaintiff alleges other inmates told him Tabor bragged that he was going to have Plaintiff placed in segregation and that he was going to make it his "mission in life" to keep Plaintiff in prison for another ten years due to bringing contraband into LeCI and filing grievances. *Id.* at PageID 271.

---

[20] Even when those elements are met, the defendant or defendants also must not be entitled to qualified immunity on Plaintiff's retaliation claim. *See Good v. Walworth*, No. 17-10140, 2018 WL 1406841, at *2 (E.D. Mich., 2018). However, as qualified immunity is "an affirmative defense that must be pleaded by a defendant official," *Harlow v. Fitzgerald,* 457 U.S. 800, 815 (1982), the potential issue of immunity need not be considered on initial review.

For the foregoing reasons, this Court **RECOMMENDS** Plaintiff's First Amendment retaliation claims against Weishar, Tabor, and Ritz be **ALLOWED TO PROCEED**.

Plaintiff also brings claims of retaliation against Collins, alleging Collins assisted Tabor in destroying Plaintiff's personal property in retaliation against him. *See* PageID 322, 337–38.

In relation to Collins, Plaintiff failed to plead that a constitutionally protected interest motivated the alleged adverse actions taken by Collins. Instead, Plaintiff appears to allege that Collins harassed Plaintiff to satisfy Weishar and/or Tabor, not because Plaintiff was engaged in any certain action. While searching a prisoner's cell and seizing legal paperwork or other personal property could constitute an adverse action, *see e.g. Wiley*, 2012 WL 5878678, at *13, a plaintiff must also allege the retaliatory actions were performed because a plaintiff was or had been engaged in activity that was constitutionally protected. *Id.* In other words, Plaintiff's harassment claims against Collins lack the requisite connection between some constitutionally protected behavior and the allegedly retaliatory actions to proceed.

For these reasons, this Court **RECOMMENDS** Plaintiff's First Amendment retaliation claims against Collins be **DISMISSED without prejudice**.

### 4. Fourth Amendment – Malicious Prosecution

Although also not specifically stated as a formal claim, Plaintiff's allegations that prison disciplinary procedures were wrongfully brought against him based on the allegedly false reporting of defendants Weishar and Tabor could be construed as an attempt to bring a malicious prosecution claim under the Fourth Amendment. *Barnes v. Wright,* 449 F.3d 709, 715 (6th Cir. 2006). Such a claim has been recognized by the Sixth Circuit and described as being "'entirely distinct' from that of false arrest, as the malicious-prosecution tort 'remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process.'" *Sykes v. Anderson,* 625

43

F.3d 294, 308 (6th Cir. 2010) (quoting *Wallace v. Kato,* 549 U.S. 384, 390 (2007)) (emphasis in original).

In *Sykes* the Sixth Circuit described the elements of a successful malicious prosecution claim premised on a Fourth Amendment violation as follows:

> First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute. Second, because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution. Third, the plaintiff must show that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure. Fourth, the criminal proceeding must have been resolved in the plaintiff's favor.

*Id.* at 308–09 (cleaned up).

Even assuming for the purposes of this initial review that an inmate can allege a malicious prosecution claim in the context of prison disciplinary proceedings, Plaintiff's malicious-prosecution claims fail regardless of whether they meet the first three elements set forth in *Sykes* because the disciplinary proceedings at issue here were not terminated in Plaintiff's favor.  *See Heck v. Humphrey*, 512 U.S. 477, 484, 489-490, (1994) ("One element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused."). Therefore, to the extent Plaintiff sought to bring claims under the Fourth Amendment for malicious prosecution against Tabor and Weishar, the Court **RECOMMENDS** those claims be **DISMISSED without prejudice** for failure to state a claim upon which relief may be granted.

Additionally, although it also appears Plaintiff alleges he was "read his rights" by an Ohio State Highway Patrol trooper relating to the allegation that Plaintiff was bringing contraband into the prison, Doc. 17 at PageID 254–55, it is unclear if a criminal prosecution was brought or if an additional deprivation of liberty resulted from that prosecution.  While Plaintiff alleges he was

indicted for "contraband" in a Warren County Court, but that the counts were dismissed March 29, 2023, it is unclear from the Complaint whether the Warren County Court action is related.  As such, to the extent Plaintiff sought to bring claims under the Fourth Amendment for malicious prosecution against Tabor and Weishar for additional criminal prosecution outside of the prison context, the facts as stated here are deficient to proceed.  The Court therefore **RECOMMENDS** those claims be **DISMISSED without prejudice** for failure to state a claim upon which relief may be granted.

### 5. *Fourth Amendment - Search and Seizure*

Plaintiff alleges he was subjected to "daily" cell and strip searches by Weishar while at GCI, and by Tabor at LeCI.  Doc. 17 at PageID 244, 248–49, 260–61.   He also alleges that his personal property was searched, and some was taken by Ritz, Collins, and Tabor during multiple searches of Plaintiff's cell, in violation of his Fourth Amendment rights.[21]  Doc. No. 17 at PageID 328.   These claims as pleaded are insufficient to state a Fourth Amendment search and seizure claim.

As an initial matter, there is no reasonable expectation of privacy in a prison cell which would entitle a prisoner to the protection of the Fourth Amendment against unreasonable cell searches.  *Hudson v. Palmer*, 468 U.S. 517 (U.S. 1984).  To the extent Plaintiff intends to allege the frequent and allegedly baseless searches of his cell violated the Fourth Amendment, such a claim should not proceed as typically prisoners maintain no right to privacy in their cells.  *See Id.* at 527–28 ("A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure

---

[21] Plaintiff also appears to allege this property deprivation violated his Fourth Amendment right to be free from unreasonable search and seizure.  Doc. No. 17 at PageID 328.  This claim will be addressed separately.

institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security."). Moreover, "[a]ssuming that the Fourth Amendment protects against the destruction of property, in addition to its mere seizure, the same reasons that lead us to conclude that the Fourth Amendment's proscription against unreasonable searches is inapplicable in a prison cell, apply with controlling force to seizures." *Id.* at 528, n. 8. This is so as "[p]rison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests." *Id.*

Therefore, to the extent Plaintiff seeks to bring claims under the Fourth Amendment against Weishar and Tabor relating to their alleged frequent searches of his cell, or against Ritz, Collins and Tabor for seizure of personal property contained in his cell, the Court **RECOMMENDS** those claims be **DISMISSED without prejudice** for failure to state a claim upon which relief may be granted.

As to Plaintiff's claims regarding frequent and unnecessary strip searches by Weishar and Tabor, while recognizing the need for officials to maintain "safety and order at" prisons, in *Stoudemire v. Michigan Dept. of Corrections*, 705 F.3d 560 (6th Cir. 2013), the Sixth Circuit acknowledged that any type of "strip search" is far more intrusive than a mere cell search or other "pat-down" body search and may implicate the Fourth Amendment.[22] *Id.* at 572-573. The Supreme Court devised a balancing test for evaluating the constitutionality of strip searches of inmates, *see Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012), which the Sixth Circuit has distilled into the following three steps: (1) a determination of

---

[22] As discussed by the First Circuit, "a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Wood v. Clemons,* 89 F.3d 922, 928 (1st Cir. 1996).

the nature of the intrusion, including the scope, manner, and location of the search, (2) evaluation of the need for the search, giving due deference to the correctional officer's exercise of his or her discretionary functions, and (3) determination of whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion. *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 482 (6th Cir. 2017) (cleaned up).

In relation to the first consideration, courts have looked at the frequency of the searches, who and how many people were present for them, and what type of bodily search was performed. *See Fugate v. Erdos*, No. 1:19-cv-30, 2021 WL 221995, at *10 (S.D. Ohio 2021) (comparing a search where a double amputee plaintiff was permitted to retain her underwear while the search was undertaken as opposed to a different plaintiff being forced to remove his underwear and spread his buttocks for visual inspection three times per day for 30 days). With respect to the remaining two considerations, it is well-established that detecting and deterring contraband within the confines of a jail or prison is both necessary and a legitimate penological objective. *Florence*, 566 U.S. at 328–29. And as courts will afford prison officials a great deal of deference in reviewing the legitimacy of stated penological objectives, "[a]bsent proof to the contrary, [a court] must assume that a search of a prisoner is initiated in an effort to detect and deter contraband." *Stoudemire*, 705 F.3d at 573. Ultimately, in balancing these three interests, courts have routinely upheld strip searches when they are conducted as part of the inmate booking process or after contact visits with someone outside the institution. *See*, *e.g.*, *Florence*, 566 U.S. 330-34; *Bell v. Wolfish,* 441 U.S. 520, 558 (1979).

There is no blanket exception to the need for constitutional scrutiny for searches conducted on inmates, however, regardless of how violent or dangerous they may appear or where they are housed. *Erdos*, 2021 WL 221995, at *9. Moreover, courts may also examine "obvious, easy

47

alternatives that accommodate the inmate's privacy interests at little cost to valid penological objectives" when balancing the various interests. *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572 (6th Cir. 2013); *Williams*, 907 F.3d at 935 (quoting *Salem v. Mich. Dept. of Corrections*, 643 Fed. App'x. 526, 530 (6th Cir. 2016)) (additional citation omitted); *accord, Sumpter v. Wayne Cty*, 868 F.3d 473, 483 (6th Cir. 2017).

Here, Plaintiff alleges that after he filed a police report regarding Weishar's behavior he was strip searched.[23] Doc. 17 at PageID 244. He further alleges that on May 17, 2021, three days after his transfer to LeCI, defendant Weishar contacted defendant Tabor and Tabor agreed to continue performing multiple strip searches of Plaintiff due to Plaintiff's use of the prison grievance system. Doc. 17 at PageID 248–49. Further, Plaintiff alleges that on November 29, 2021, after he accused Tabor of fabricating information contained in a conduct report, Plaintiff was told he was being taken to mental health but was instead grabbed by Tabor and several other officers where he was strip searched in the C/O's restroom. *Id.* at PageID 260.

Specifically, Plaintiff alleges the strip searches were frequent and that defendant Tabor's stated basis for doing them was because he was entitled to due to Plaintiff's status as a prisoner and in retaliation for Plaintiff's filing of prison grievances. *Id.* at PageID 249. While these reasons are seemingly not reasonable penological purposes, Plaintiff also indicates Tabor and Weishar were continually looking for contraband in Plaintiff's cell and on his person, which as noted, is considered as a valid reason for such searches. More importantly, Plaintiff does not address the frequency of the searches, who and how many people were present for them, where they occurred (aside from the one incident in the C/O's restroom, or what type of bodily search was performed,

---

[23] It is unclear if Plaintiff alleges Plaintiff was strip searched once or if he was strip searched daily, and if the searches were daily, how frequently the strip searches took place or where. *See* Doc. 17 at PageID 244 (stating "I was strip search, and cell was searched daily.").

which is necessary for the Court to determine whether any of the searches or their combined effect was overly intrusive under the Fourth Amendment.

For these reasons, this Court **RECOMMENDS** Plaintiff's Fourth Amendment search claims against Tabor relating to Plaintiff's strip search allegations be **DISMISSED without prejudice**.

### 6. Eighth Amendment – Cruel and unusual punishment

The Eighth Amendment's prohibition against cruel and unusual punishments "imposes duties on [prison] officials, who must provide humane conditions of confinement [and] 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). "To prove that a defendant was deliberately indifferent to a prisoner's health or safety, the plaintiff must show both that the (1) alleged mistreatment was objectively serious; and (2) the defendant subjectively ignored the risk to the inmate's safety." *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011).

Plaintiff alleges numerous claims which fall under the umbrella of Eighth Amendment protection, each of which shall be addressed separately here.

#### a. *Failure to protect - Deliberate indifference to inmate safety*

Plaintiff alleges that defendant Waggoner failed to protect him by leaving Plaintiff unattended so Plaintiff could be physically assaulted by one inmate resulting in physical injury to him and him getting sick due to a second assault with bodily fluids by another inmate, and that defendant Sparks failed to act on Plaintiff's allegations that prison officers were allowing inmates to attack him. Doc. 17 at PageID 263–64, 266, 327. He also alleges Tabor and Weisher failed to protect him as Weishar released a confidential statement signed by Plaintiff to the inmate against whom Plaintiff had informed, putting Plaintiff in serious danger of bodily harm by that inmate and

49

the gang population generally due to his being labelled a "snitch." *Id.* at PageID 251–52. Further, Plaintiff attests that Tabor had learned that Weishar released Plaintiff's confidential statement to the inmate and informed Plaintiff, agreeing Plaintiff was in danger due to the information's release, but declined to do anything to keep Plaintiff safe when Plaintiff asked him (and that instead Tabor had him escorted to his office frequently purposefully placing his safety at risk due to the belief that he was a snitch). *Id.* at PageID at 252, 262. All of these claims should proceed.

Inmates have a constitutionally protected right to personal safety grounded in the Eighth Amendment. *Farmer*, 511 U.S. at 833. Thus, prison staff are obliged "to take reasonable measures to guarantee the safety of the inmates" in their care. *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). In particular, because officials have "stripped [prisoners] of virtually every means of self-protection[,]" "officials have a duty to protect prisoners from violence at the hands of other prisoners." *Id.* at 833. Identification of a prisoner as an informant or snitch may constitute deliberate indifference to the inmate's safety. *See Comstock v. McCrary*, 273 F.3d 693, 699 n.2 (6th Cir. 2001).

To establish a constitutional violation based on failure to protect, a prison inmate must show that the risk of harm is substantial and that the failure to protect from the risk of harm is objectively sufficiently serious. *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (internal citations and quotations omitted). Courts may consider factors such as the relative size, mental capacity, and nature of the inmate when considering the potential for harm a situation poses. *Id.* A plaintiff also must show that prison officials acted with "deliberate indifference" to inmate health or safety which requires a showing that an official is both "aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 834, 837. Such knowledge can be inferred via circumstantial

50

evidence or "from the very fact that the risk was obvious." *Id.* at 842. However, a prison official who was unaware of a substantial risk of harm to an inmate may not be held liable under the Eighth Amendment even if the risk was obvious and a reasonable prison official would have noticed it. *See id.* at 841–42.

While a prisoner does not need to prove that he has been the victim of an actual attack to bring a personal safety claim, he must at least establish that he reasonably fears such an attack. *Thompson v. Cnty. of Medina*, 29 F.3d 238, 242–43 (6th Cir. 1994). Put another way, a plaintiff has the minimal burden of "showing a sufficient inferential connection" between the alleged violation and inmate violence to "justify a reasonable fear for personal safety". *Id.*

At this stage of the proceedings, without the benefit of an answer or other briefing, this Court **RECOMMENDS** Plaintiff's Eighth Amendment failure to protect claims against Weishar, Tabor, and Waggoner be **ALLOWED TO PROCEED**.

### b. *Deliberate indifference to medical needs*

Plaintiff brings a claim of deliberate indifference to medical needs in violation of the Eighth Amendment against defendant John Doe Medical Department for two incidents: (1) failing to provide him medical treatment after being punched in the head, face and torso, and kicked all over his body while he was lying on the ground outside of his cell by another inmate, and (2) failing to provide medical treatment after being assaulted with contaminated human waste including spit, urine, and feces and having been fed spoiled milk, which Plaintiff alleges resulted in his becoming severely ill. Doc. 17 at PageID 264–65, 333.

As an initial matter, while as previously discussed, claims cannot proceed against a prison medical department as it is not a person within the meaning of § 1983, s*ee Hix*, 196 Fed. Appx. at

51

355, even if Plaintiff were to be granted leave to amend his complaint to name an individual in the LeCI medical department as a defendant, his claims as pleaded should fail.

Prison officials are forbidden from "'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward [his] serious medical needs." *Blackmore v. Kalamazoo County,* 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle,* 429 U.S. at 104). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997). The subjective element requires a showing that prison officials have "a sufficiently culpable state of mind in denying medical care." *Id.* (internal citation and quotation omitted).

Because society does not expect that prisoners will have unqualified access to health care, however, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are "serious." *See Estelle,* 429 U.S., at 103-104. A sufficiently serious medical need is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash,* 539 F.3d 510, 518 (6th Cir. 2008) (citations omitted).

Serious medical needs have been found when a failure to treat an injury or condition could result in "further significant injury or the unnecessary and wanton infliction of pain." *Ford v. LeMire*, No. 03-CV-10176-BC, 2004 WL 1234137, at *4 (E.D. Mich. June 1, 2004) (internal quotations omitted) (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir.1992), *overruled on other grounds by WMX Technologies v. Miller,* 104 F.3d 1133 (9th Cir. 1997)). By example, nonobvious and minor injuries including minor cuts and bruises resulting from a glass splinter that required neither stitches nor painkillers was found not serious enough to support an Eighth

Amendment claim.  *See Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 98 (6th Cir. 2004) (collecting cases).

Here, in relation to the inmate attack, Plaintiff alleges that medical staff failed to examine or treat him for injuries to his head, face and body, instead simply checking his blood pressure and giving him a paper towel to clean himself with.  Doc. 17 at PageID 264.  Plaintiff further alleges he was simply "left in pain" until he healed but provides no description of his pain or any description of the nature of his injuries.  *Id.*  In relation to Plaintiff's claim that he was assaulted with bodily fluids by another inmate, he claims he was left cuffed for 45 minutes before being taken to medical where he received a towel with soap to wipe his face and was told he would be okay.  *Id.* at PageID 265.  Plaintiff alleges that after his visit to medical he had a fever, diarrhea, nausea, vomiting, and a loss of appetite.  *Id.*

More description is necessary to determine if his injuries would have been recognizable as requiring more medical attention than he was given as Plaintiff's description of being sick or in pain is too vague to make any judgment about the nature and severity of the alleged injuries.  *Id.* Plaintiff also does not allege how long the alleged pain or illness lasted or any ongoing medical issues relating to his injuries or illness which would assist in making such a determination. *Id.* at 263–64.

As this Court cannot conclude that an attack resulting in undescribed "pain" constitutes a "serious medical need" or that being assaulted with bodily fluids resulting in flu-like symptoms for an undisclosed period of time meets the "culpable state of mind standard" required for Eighth Amendment protection, even if Plaintiff were to amend his Complaint to include an appropriate defendant, this Court **RECOMMENDS** all claims against John Doe LeCI medical department and staff for deliberate indifference to medical needs to be **DISMISSED without prejudice**.

### c. *Conditions of confinement*

Plaintiff alleges an Eighth Amendment conditions of confinement claim against Tabor and Harris for the filthy cell conditions he was held in while at LeCI, Doc. 17 at PageID 272, and the Court also construes his claims against Weishar and Tabor for placement in administrative segregation as discussed *supra* under Plaintiff's procedural due process claims, as a potential conditions of confinement claim. *Evans v. Vinson*, 427 Fed.Appx. 437, 443 (6th Cir. 2011) (considering a plaintiff's administrative segregation as an Eighth Amendment conditions of confinement claim). Plaintiff also contends defendant Weisher's placement of Plaintiff in disciplinary confinement caused him to lose "lower level-2 privileges," constituting Eighth Amendment cruel and unusual punishment. Doc. 17 at PageID 319.

The Eighth Amendment's prohibition against cruel and unusual punishment is applicable to inhumane conditions of confinement. *Farmer v. Brennan* 511 U.S. 825 (1994). "[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id.* at 832 (quoting *Palmer*, 468 U.S. at 526-27). However, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987). Instead, "[e]xtreme deprivations are required to make out a conditions-of-confinement claim." *McMillian*, 503 U.S. at 9.

As an initial matter, placement in administrative segregation alone does not give rise to an Eighth Amendment claim "[b]ecause placement in segregation is a routine discomfort that is a part of the penalty that criminal offenders pay for their offenses against society, it is insufficient to support an Eighth Amendment Claim." *Murray v. Unknown Evert,* 84 Fed. Appx. 553, 556 (6th

Cir. 2003); *See Bennett v. Smith*, 110 Fed. Appx. 633, 634–35 (6th Cir. 2004) (citing *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Mackey v. Dyke,* 111 F.3d 460, 463 (6th Cir. 1997)).  Any Eighth Amendment claim relating to his placement in administrative segregation must fail however, because Plaintiff does not allege that he was denied basic human needs resulting from his segregation or that the loss of privileges constituted a denial of basic human needs.  *See Hudson v. English*, 2007 WL 1452735, at *1 (W.D. Mich. 2007) (finding that a fourteen-day loss of privileges arising from being placed in administrative segregation did not implicate the Eighth Amendment because no loss of basis human needs were alleged).

As such, this Court **RECOMMENDS** all Eight Amendment claims against Weishar and Tabor relating to the placement of Plaintiff in administrative segregation and the resulting loss of privileges be **DISMISSED without prejudice** for failure to state a claim.

As to Plaintiff's conditions of confinement claim relating to the cell conditions at LeCI, "[a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  Therefore, to state a claim a plaintiff must allege (1) a deprivation that is objectively "sufficiently serious," for example, that the plaintiff is "incarcerated under conditions posing a substantial risk of serious harm," and (2) that the defendant prison official has a "sufficiently culpable state of mind," specifically one of "deliberate indifference" to inmate health or safety. [24]  *Farmer*, 511 U.S. at 834 (citations and internal quotations omitted).

---

[24] A plaintiff need not allege actual knowledge on the part of a defendant, however, as a plaintiff may demonstrate, and a factfinder may conclude, that an official had knowledge of the risk via circumstantial evidence and inference or from the very fact that the risk was obvious.  *Barker*, 649 F.3d at 434 (internal quotation mark omitted) (quoting *Bouchard,* 449 at 729 (quoting *Farmer,* 511 U.S. at 842) (internal quotation mark omitted)).

Temporary inconveniences generally do not demonstrate that conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency required to support a conditions of confinement claim. *See Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001).  Moreover, while "there is a substantial risk of serious harm in the denial of the minimal civilized measure of life's necessities, including adequate food, clothing, shelter, medical care, and reasonable safety," *Barker v. Goodrich*, 649 F.3d 428, 434–35 (6th Cir. 2011) (cleaned up) (quoting *Spencer v. Bouchard,* 449 F.3d 721, 727–28 (6th Cir. 2006) (quoting *Farmer,* 511 U.S. at 834) (internal quotation mark omitted)), even when there are multiple deprivations relating to such items, "short term deprivations of toilet paper, towels, sheets, blankets, mattresses, toothpaste, toothbrushes and the like"[25] lasting several days "do not rise to the level of a constitutional violation," whereas long term deprivations of the same items may. *Gilland v. Owens*, 718 F. Supp. 665, 685 (W.D. Tenn. 1989).

Here, Plaintiff alleges that while housed in segregation at LeCI for a hearing in July of 2022, he was held by Tabor in a cell that was "filthy, unsafe, and in a hazard[ous] condition . . . [containing] a strong smell of human waste and dead mice . . . [and] was also infested with mice and roaches and over flowed with toxic water was on the floor from the toilet," which, along with the sink, was to unsanitary to touch, and that Plaintiff was denied cleaning products when he

---

[25] Courts in this circuit have found that "the Eighth Amendment does not require that prisoners enjoy immediately available and flushable toilets," *Abdur-Reheem-X v. McGinnis*, No. 99-1075, 1999 WL 1045069, at *1 (6th Cir. Nov. 12, 1999), nor is the Eighth Amendment implicated when an inmate is deprived of a meal for one night, *Grzelak v. Washington*, No. 1:19-CV-1003, 2020 WL 289229, at *3 (W.D. Mich. Jan. 21, 2020), or a mattress for two weeks, *Jones v. Toombs*, No. 95-1395, 1996 WL 67750, at *1 (6th Cir. Feb. 15, 1996).  No Eighth Amendment claim has been found due to temporary discomforts resulting from placement in a "dry cell" for 14 days without running water. *Wiley v. Ky. Dep't of Corr.*, No. 11-97-HRW, 2012 WL 5878678, at *4 (E.D. Ky. Nov. 21, 2012).  Nor has two several day exposures to cold conditions been long enough to be considered a serious deprivation under the Eighth Amendment.  *Glover v. Grant Cty. Det. Ctr.*, No. 10-00088-DLB, 2010 WL 2804054, at *4 (E.D. Ky. July 15, 2010); *see also Clark v. Spey*, No. 01-C-9669, 2002 WL 31133198 (N.D. Ill. Sept. 26, 2002) (finding inmate held overnight in cold cell with no toilet did not state a claim).

requested them. *Id.* Plaintiff also alleges he was left without a mattress for several hours and was not able to shower for the "days" he was there. Doc. 17 at PageID 272.

Even taking Plaintiff's allegations as true, *see Denton v. Hernandez,* 504 U.S. 25, 33 (1992) (requiring the court to accept a plaintiff's allegations as true, unless they are clearly irrational or wholly incredible), in relation to the conditions Plaintiff was allegedly subjected to during his stay at LeCI, it does not appear Plaintiff was subjected to those conditions for more than a few days as Plaintiff had returned to OSP a week later. Doc. 17 at PageID 272. Such a short-term, temporary confinement is not of a nature to be considered a serious deprivation. Moreover, Plaintiff wholly failed to meet the second requirement for a conditions of confinement claim, as his Complaint contains no allegations which would support a finding on deliberate indifference on part of Tabor. Therefore, even if the alleged condition divested Plaintiff of basic essentials of life, he failed to establish Tabor's "deliberate indifference" to the conditions in which he was held.[26]

For these reasons, this Court **RECOMMENDS** all Eight Amendment claims against Tabor relating to the conditions of Plaintiff's cell at LeCI be **DISMISSED without prejudice** for failure to state a claim.

### 7. Civil Conspiracy

Although not specifically stated as a formal claim, the Court collectively construes Plaintiff's allegations as bringing a civil conspiracy claim against all defendants for conspiring to deprive Plaintiff of his constitutional rights. *See generally* Doc. 17 at PageID 241–316.

---

[26] Plaintiff also alleges defendant Harris violated his rights to due process by creating a policy and custom of allowing officers to place inmates in filthy cells containing rats and human feces. Doc 17 at PageID 333. While the right to safe conditions of confinement involves liberty interests protected by due process, *see Youngberg v. Romeo*, 457 U.S. 307, 315 (1982), as discussed in relation to his claims against Tabor, Plaintiff's Eighth Amendment rights were not violated by his short stay in an allegedly unclean cell.

To prevail on a claim of civil conspiracy in violation of § 1983, a plaintiff must show that there is "an agreement between two or more persons to injure another by unlawful action." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007)). To state a claim of civil conspiracy under § 1983, on initial review a plaintiff must plead enough facts to support a reasonable inference "that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant." *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). Although the plaintiff does not have to prove an express agreement between the conspirators, he cannot rely on "vague and conclusory allegations unsupported by material facts ...." to meet the pleading standard. *Id.* (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)).

> It is the fundamental law of conspiracy or joint venture that a conspiracy is an agreement among two or more parties to achieve a result, plus an overt act by at least one conspirator to that end. Where either the intended result or any of the methods used are illegal, from the time of the first overt act all non-immune coconspirators are liable for the acts of any co-conspirator.

*Macko v. Byron*, 555 F. Supp. 470, 476 (N.D. Ohio 1982) (citing *Dennis v. Sparks,* 449 U.S. 24 (1980); *Griffin v. Breckinridge,* 403 U.S. 88, 103 (1971); *Cameron v. Brock,* 473 F.2d 608 (6th Cir. 1973); *Saier v. State Bar of Michigan,* 293 F.2d 756, 761 (6th Cir. 1961)).

As it is unlikely that direct evidence such as testimony of a conspiratorial agreement exists, a plaintiff need only establish a possibility that the jury can "infer from the circumstances [that the alleged conspirators] had a 'meeting of the minds' and thus reached an understanding" to achieve the conspiracy's objectives. *Adickes v. Kress & Co.,* 398 U.S. 144, 158–59 (1970). Civil conspiracy claims, however, are not supported by allegations that an "incident occurred unexpectedly" or under "ambiguous circumstances." *Crawford v. Geiger*, 131 F. Supp. 3d 703,

712 (N.D. Ohio 2015), *aff'd in part, rev'd in part and remanded*, 656 F. App'x 190 (6th Cir. 2016). While a plaintiff may rely on circumstantial evidence to establish a conspiracy, they nonetheless must prove an agreement, therefore, "merely failing to prevent the unlawful conduct of one party or assisting an unlawful actor does not necessarily constitute a conspiracy." *Webb v. Local 73, Service Employees Intern., AFL-CIO,* 2002 WL 31497352, *2 (N.D. Ill. 2002).

The Court construes Plaintiff's claims that Weishar, Tabor, Collins, and Ritz conspired to continue harassing Plaintiff for filing prison grievances and that the facts as alleged, provide enough detail to allow the Court to draw a reasonable inference that defendants Weishar, Tabor and Ritz are liable for the alleged misconduct. Doc. 17 at PageID 248–49, 270–73.

As taken collectively, and without the benefit of an answer or other briefing, the Court deems the factual allegations provide enough detail to state a claim, and **RECOMMENDS** Plaintiff's civil conspiracy claims against Tabor, Weishar, and Ritz are allowed to **PROCEED** and that any civil conspiracy claims against any other defendants be **DISMISSED without prejudice** for failure to state a claim.

### 8. Respondeat Superior

Plaintiff appears to attempt to link the claims of wrongdoing which this Court recommends being allowed to proceed againsTabor, Weishar, Waggoner, and Ritz, to Wardens Harris, Bracy and Director Chambers-Smith in their supervisory capacity. Such claims should not proceed.

Section 1983 liability cannot be imposed solely upon the basis of *respondeat superior. See Taylor v. Mich. Dep't of Corr.,* 69 F.3d 76, 80–81 (6th Cir. 1995). "In order to find supervisory personnel liable under § 1983, the plaintiff must allege that the supervisor condoned, encouraged, or knowingly acquiesced in the alleged misconduct." *Bennett v. Smith*, 110 Fed. Appx. 633, 635 (6th Cir. 2004) (citing *Taylor*, 69 F.3d at 80–81). In other words, to prevail on such a claim,

Plaintiff must allege some knowledge on part of the supervisor that the alleged misconduct was taking place – vague references are not enough.

For example, in the case of *Provost v. City of Newburgh*, 262 F.3d 146 (2d Cir. 2001), the Second Circuit clarified that when it used the phrase "direct participation" in connection with the personal involvement required for individual liability that "direct participation" requires "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." 262 F.3d at 155 (footnote omitted); *see also Coleman v. Houston Independent School Dist.*, 113 F.3d 528, 534 (5th Cir. 1997) (holding that it is firmly established that individual liability under § 1983 may not be predicated on the vicarious liability doctrine of respondeat superior and that only direct acts or omissions of government officials, not the acts of subordinates, will give rise to individual liability under § 1983).

Here, Plaintiff alleges no claims that Harris, Bracy or Director Chambers-Smith were directly involved in the decisions of Waggoner, Tabor, Ritz, or Weishar or that they "condoned, encouraged, or knowingly acquiesced in the alleged misconduct." *Smith-El v. Steward*, 33 Fed. Appx. 714, 716–17, 2002 WL 193931, at *2 (6th Cir. 2002) (citing *Taylor*, 69 F.3d at 80–81). Moreover, to the extent Plaintiff intended to bring an Eighth Amendment claim against Harris based on his supervision of Tabor as relating to the unsanitary cell conditions at LeCI, Section 1983 liability will not be imposed solely upon the basis of respondeat superior.

Because Plaintiff did not raise any allegations of direct participation by Harris or any facts supporting ongoing issues with unsanitary conditions outside of this isolated incident relating to the cell conditions at LeCI, or any allegations of direct participation by Harris, Bracy, or Chambers-Smith in any of the alleged conduct by Waggoner, Tabor, Ritz, or Weishar, this Court **RECOMMENDS** all Eight Amendment claims of condition of confinement and due process

against Harris relating to Plaintiff being placed in a "filthy cell" at LeCI, and against Harris, Bracy, and Chambers-Smith for the actions Waggoner, Tabor, Ritz, or Weishar be **DISMISSED without prejudice** for failure to state a claim.

### IV.    CONCLUSION

Having conducted the initial screen required by law, **IT IS THEREFORE RECOMMENDED THAT:** The following claims set forth in Plaintiff's Complaint be allowed to **PROCEED**: (1) First Amendment retaliation and harassment claims against defendants Weishar, Tabor, and Ritz in their individual capacities; (2) Eighth Amendment failure to protect claims against defendants Waggoneer, Tabor and Weishar in their individual capacities; and (3) civil conspiracy against Tabor, Weishar and Ritz.  The Court **RECOMMENDS** that all remaining claims against all defendants in their individual and official capacities be **DISMISSED** for failure to state a claim.

The Court further **RECOMMENDS** that the District Court certify pursuant to 28 U.S.C. § 1915(a)(3) that for the foregoing reasons an appeal of an Order adopting this Report and Recommendations would not be taken in good faith, and consequently, leave for Plaintiff to appeal *in forma pauperis* should be denied.


April 24, 2024                              *s/Stephanie K. Bowman*
                                            Stephanie K. Bowman
                                            UNITED STATES MAGISTRATE JUDGE

## Procedure on Objections to Report and Recommendation

If any party objects to this Report and Recommendation, that party may, **within fourteen (14) days** of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A Judge of this Court shall make a *de novo* determination of those portions of the Report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).